VIRGO, The (BRENNAN v.). See Case No. 1,831.

VIVIAN, The ALICE. See Case No. 197.

## Case No. 16,977.

### The VIVID.

#### [3 Ben. 397.] [1]

District Court, E. D. New York. Sept., 1869.

ADMIRALTY PRACTICE—BONDING—FREIGHT.

Where several libels had been filed against a vessel, to recover amounts exceeding her value, and the owners applied to have her discharged, on their giving one stipulation in the amount of her value, *held,* that the amount of the freight was not to be included in the stipulation.

This was an application on the part of the claimants of the vessel, against which several libels had been filed, to recover amounts in all exceeding her value, to have the vessel discharged from all the claims, on their giving one stipulation in her value. The libellants claimed that the amount of the stipulation to be given should be equal to the value of the vessel and the freight.

Wm. D. Booth, for libellant.
Ruggles & Felt, for claimant.

[See Case No. 16,978.]

## Case No. 16,978.

### The VIVID.

#### [4 Ben. 319; [1] 14 Int. Rev. Rec. 163.]

District Court, E. D. New York. Oct., 1870.

DAMAGE TO CARGO—UNSEAWORTHINESS—EVIDENCE —PROTEST—SURVEY.

1. A bark was loaded with sugar and molasses in Porto Rico, and lay in the harbor apparently right, but was found, one morning, to have seven feet of water in her hold. Her cargo was discharged, and she was re-caulked above her copper, and the cargo which had not been destroyed was re-shipped; and she brought it to New York, where libels were filed against her to recover for the loss and injury to the cargo. The defence was set up in the answers, that a heavy swell on the night in question had opened her seams, and broken the pipe which led to the water closet, and thus admitted the water, so that the loss was occasioned by a peril of the sea. The witnesses for the bark, while they testified to the

heavy rolling of the vessel, testified also that no water came in through the seams. *Held,* that this discrepancy between the answer and the evidence in behalf of the bark, together with the fact that the broken water-closet pipe was not discovered till after the arrival of the bark in New York, and that the protest made no mention of any heavy sea or heavy rolling of the ship, threw discredit upon the evidence of the rolling.

2. When goods are lost by the vessel, on which they are shipped, springing a leak while at anchor in a harbor, the shipowner must show some stress of weather, or other circumstance, sufficient to account for such a leak in a vessel of ordinary strength.

3. On the evidence, no such cause for the leak was shown in this case, and the leak was caused by the unseaworthy condition of the bark.

4. The rules of evidence in courts of admiralty are not as stringent as in courts of common law.

5. Where a copy of a protest was offered in evidence, without any proof of its correctness as a copy, but it was proved that a protest was made at the time and place where the copy purported to have been made, and that it was signed by the mate of the bark, and the mate, though called as a witness in court, was not asked in relation to the truth of the copy, and did not dispute it, *held,* that the copy was admissible in evidence.

6. A copy of a survey, not purporting to have been made by any one connected with the vessel, was excluded as evidence, no witness able to prove or disprove its correctness being called, or shown to be within reach.

In admiralty.

Wm. D. Booth, for libellants.
Ruggles & Felt and E. C. Benedict, for claimants.

BENEDICT, District Judge. These actions are brought to recover of the bark Vivid the value of certain sugars, shipped on board that vessel in Ponce, Porto Rico, to be transported to New York under bills of lading in the ordinary form, and which were destroyed under the following circumstances: The bark, a vessel ten or twelve years old, having been absent from New York without repairs for about a year, was loaded in Ponce for New York with a cargo consisting of 505 boxes of sugar, 130 hogsheads of molasses, and 30 tons of lignum vitæ wood. Her loading was completed on the 4th day of June, 1869, when at nightfall she lay at anchor in the harbor, ready for sea, drawing fifteen feet of water, and apparently tight. The next morning, at daylight, she was found to have some seven feet of water in her hold. The pumps were set to work; but it was found necessary to discharge all the cargo between decks before the leak was got under. It was then determined to recaulk her, and accordingly the whole cargo was discharged, the vessel caulked above her copper, and the portion of the cargo not destroyed by the water which had come into the vessel was reladen, and the bark proceeded with it to New York, where she arrived in safety without further damage. The value of the sugars thus destroyed amounted to about $35,000, while the value of the vessel is but about $2,000. This loss, as far as the value of the vessel will go towards it, the libellants now seek to recover, upon the ground that the vessel, when she was loaded in Ponce, was unsea-

worthy, and the loss solely attributable to her weak condition. The defence is that, on the night of the 4th of June, after the cargo was in, the vessel was caused to roll and labor heavily in the trough of the sea, by reason of a heavy swell which arose, whereby the seams of the vessel were opened, and the pipe leading from the water closet to the outside of the vessel broken, and thus the water was admitted, which dissolved and destroyed the sugars; and it is accordingly insisted that the loss is attributable solely to a peril of the sea. To prove this defence, the claimants have introduced three witnesses, the mate and the steward of the bark, and a shipwright who examined her after she arrived in New York. The mate and steward both testify to a heavy sea on the night of the 4th of June, and that the bark rolled heavily in it—as the mate says, so heavily that he was afraid for his masts, and put rolling tackle' on his main yard. The mate, steward and shipwright likewise testify to the good condition and tightness of the vessel when the cargo was taken in; and the shipwright proves that, on repairing the vessel in New York, the water-closet pipe was found partly torn away from the flange, where it is fastened to the outside of the vessel; which point was below the water line as the bark was first loaded in Ponce, but was not below that line on the voyage to New York.

Of this evidence, a necessary part for a successful defence is that which goes to prove an excessive rolling of the bark in a heavy sea on the night of the 4th of June. But this part of the claimants' evidence is rendered doubtful, and open to the suspicion of being at least highly colored, by the other portion of the testimony of the same witnesses in regard to the condition of the vessel, wherein they all declare that no water was taken in through the seams of the vessel. This declaration is made emphatically; and, upon such evidence standing alone, it might have been inferred that the breakage of the water-closet pipe was the cause of the leak, and the vessel accordingly discharged from responsibility, upon the ground that a vessel able to endure without any other injury such a sea as the mate describes, when loaded as this vessel was, was manifestly seaworthy. And yet, in contradiction of this testimony, the answer is found to aver that the vessel's seams were opened, and water thus admitted to the cargo. The shipwright is wrong then when he swears that the condition of the oakum, when he examined it in New York, showed that water had not passed through the seams. And if the seams were opened, as the answer admits, it is difficult to understand how the mate and steward could have examined the vessel's seams as carefully as they describe, without finding places open. It is also probable that the break in the water-closet pipe, which was first discovered in New York, had not occurred at the time of the leak. as it would hardly have remained undiscovered when the vessel was surveyed and caulked in Ponce, after the leak, if then in existence.

The doubt thus cast upon their account of the heavy sea, which the mate and steward describe, is greatly strengthened by the fact, that the protest makes no mention whatever of any heavy sea at the time of the leak, and does not allude to any heavy rolling of the ship as the cause of the leak. Such an omission in a protest is significant; for, to use the language of Judge Hopkinson (Davis v. The Seneca [Case No. 3,650]), "in protests, the seas are always mountain high, and the wind never less than a hurricane." I can conceive no reason for omitting from a protest any allusion to the fact which is now claimed to have been the cause of the loss, and to have made a protest necessary. Against witnesses thus in conflict with the answer upon a material point (the master of the vessel not being produced, or his absence accounted for), three marine inspectors are produced by the libellants, who examined the bark after her arrival in New York, when she had sustained no injury since the leak in Ponce, who declare her to have been unfit to sustain such a cargo, and unseaworthy. She was extensively repaired before any rate could be given her, and then the rate was A 2¼. The condition of the timbers and planks of the vessel, as described by these witnesses, confirms the opinion which they express; and they are to some extent corroborated by the testimony of the shipwright, called by the claimants, who, while he says that no water could come through the seams, is far from being satisfied that the tear discovered in the water-closet pipe would account for the quantity of water the bark made. Upon a careful weighing of this testimony, I am of the opinion that the claimants have failed to show any stress of weather sufficient to cause the leak in question, had the bark been reasonably tight and staunch above her copper; and, in the absence of such proofs, it is the reasonable inference, that the loss arose from the insufficiency of the vessel. There was, at the time, no wind of any consequence; the vessel was in a harbor, and at her anchorage. She, doubtless, was able to carry a moderate cargo, but when filled to the depth of fifteen feet with sugar and molasses. she was unable to endure, without opening her seams, what I conceive to have been no more than an ordinary occurrence, such as any vessel would be expected to endure.

The law requires of the shipowner a vessel reasonably calculated to endure the ordinary strain of the navigation in which she is engaged. If his vessel be reasonably sufficient for the voyage, he is not to be held liable, by showing that a stouter ship would have outlived the peril (Macl. Shipp. p. 459); but when goods are lost by his vessel's springing a leak while at anchor in a harbor, he must show some stress of weather, or other circumstances sufficient to account for such a leak in a vessel of ordinary strength. The effort to show this, in the present case, has failed to satisfy my mind, and I must, accordingly, hold the vessel liable for the loss in question.

In arriving at this conclusion. I have attached some importance to the fact, that the

protest omits any allusion to any heavy sea, and I must, therefore, add my decision upon the question of evidence, which was raised by the objection of the claimants to the introduction of the protest in evidence. The document offered is not the original protest, but is simply a paper purporting to be a copy of a protest, and it is not accompanied with any proof of its correctness as a copy. Upon this question of evidence, I remark that, because of the great distinction which prevails between the description of causes which come under the cognizance of the courts of admiralty and those of the common law (Dr. Lushington, in deciding the case of The Peerless. 1 Lush. 41), the strict rules of evidence, applied in the courts of common law, often lose much of their force when invoked in a court of admiralty. Courts of admiralty are courts requiring dispatch, and the questions of fact brought before them often arise out of occurrences transpiring upon the sea, where time and opportunity of record are often wanting, where ledgers and letter-books are not kept, and where the living witnesses present are likely to be as floating and as unstable as the element itself on which they live; and often the transaction in question has taken place in a foreign or out-of-the-way place, in the presence of strange laws and customs, and among ignorant and sometimes barbarous men. It is, therefore, no uncommon thing for these courts, in cases where justice will be advanced thereby, to receive some descriptions of testimony never admitted in other courts—which can the more safely be permitted in these courts, because the whole case is before a single judge, supposed to be able to weigh with care and deliberation all portions of the evidence, and to determine the true significance of the attending and corroborating circumstances, and because, in admiralty, the first decision of the questions of fact is never conclusive, but is always subject to review, in the light of additional and explanatory testimony, which may be produced in the appellate court. Although questions of evidence rarely appear in the decisions of admiralty courts, illustrations of this feature of admiralty procedure are not wanting among the decided cases. The case of The Peerless, above referred to, is one where Dr. Lushington speaks of courts of admiralty as admitting in evidence "affidavits sworn almost in every way—before justices of the peace, commissioners of clearances, &c.. &c.. even evidence not on oath, as where, according to the custom of some of the states in the north of Europe, the original evidence was not taken on oath, but the person giving it undertook to make oath afterwards, if required." The case of The Estrella, 4 Wheat. [17 U. S.] 306. where hearsay testimony was admitted as such, is another illustration; so, also, the case of The Helgoland, Swab. 496, where the execution of a bottomry bond was held proved, on simply the seal of the consul. Likewise, the case of

The London Merchant, 3 Hagg. Adm. 396, where a copy of an entry of a protest before a notary—the protest not having been sworn to or extended—was admitted on the certificate of the notary that it was a true copy. The copy protest offered in evidence here appears to me admissible. as within the spirit of the cases above cited. For, on its face, it appears to be a veritable copy of a protest. and there is no adequate motive to induce the fabrication of such a document, nor is a fabrication suggested. Moreover, it is in proof that a protest was made at the time and place where this copy purports to have been made, and that it was there signed by the mate of the vessel; and. more than all, that same mate was before me as a witness on the stand. called by the claimant, and could have disputed the verity of this copy protest, but he was not asked in relation thereto. In view of this latter circumstance, I am justified in considering the copy produced to be correct, and I admit it in evidence. leaving the party objecting to show its incorrectness, by a commission to Ponce, or otherwise, if so advised.

Copy surveys were likewise sought to be read in evidence, but they stand upon a different ground. They do not purport to be made by any one connected with the vessel, and no witness able to prove or to dispute their correctness, as copies, has been called as a witness, or shown to be within the reach of the claimants. Besides, it has been adjudged that surveys are not evidence of the facts stated therein. Watson v. Insurance Co. of North America [Case No. 17.284]; Cort v. Delaware Ins. Co. [Id. 3,257]. I therefore reject the copy surveys; but, upon the protest, and other evidence in the cause. as before stated, I adjudge the libellants entitled to recover. Let decrees be entered accordingly, the form to be settled before me on notice.