FORBES et al. v. MERCHANTS' EXP. & TRANSP. CO.

(District Court, E. D. New York. July 27, 1901.)

SHIPPING—LOSS OF CARGO—UNSEAWORTHINESS OF BARGE.

A vessel some 50 years old, which had been used as a steam propeller until she had become unfit for such service, and afterwards converted into a freight barge, sank at a dock with her cargo during the night, after she had been loaded. The evidence showed that the immediate cause of her sinking was a leak due to the springing of a plank in her hull, the spikes which held it having become loosened. The only peril to which she was subjected was that from the swells caused by passing vessels, and that was one which was usual and ordinary, and was withstood by other vessels at the dock without injury. *Held*, that the presumption arising from such facts was that the barge was unseaworthy, and that her sinking was due to that cause, in the absence of evidence establishing some other adequate cause.

In Admiralty. Action for loss of cargo.

Black & Kneeland, for libelants.

James J. Macklin, for respondent.

THOMAS, District Judge. At about 3:15 o'clock on the morning of July 13, 1900, the barge James Mackin sank at Brown's dock, at Newark, N. J., on the Passaic river, and the damage to her cargo, delivered the previous evening, is the subject of this action, wherein the libelants charge that the injury was "due to, and occasioned by, the improper and unfit condition and unseaworthiness of" the barge. The answer denies unseaworthiness, and alleges that the loss "was the result of the barge James Mackin striking some unknown obstruction, or the swells or suction of passing vessels run at a high rate of speed, and dangerously near the said barge, or from some other marine peril." Alongside the face of Brown's dock the bank is very abrupt, and the water is so shallow, at ordinary low tide, that there is not more than six feet of depth. The bottom is uneven, and, as the respondent's superintendent stated, "some places it is muddy,—some mud. They had been unloading paving stones, and some fell overboard; 20 feet from the dock you have got deep water,—what we call deep water,—14 feet or 12 feet." The barge was 108 feet long, 24 feet beam, drew about 7 feet of water, and sank when the tide was about half ebb.

It is necessary to trace the history of the barge, and also to describe her condition after the accident. The vessel was built in 1848 or 1850, and was fitted for and used as a steam propeller, until 1896 or 1897, when she was condemned for such purpose, and was laid up at East Newark for some two years. The respondent purchased her in 1899, and after being overhauled, and her engine, but not her boiler, removed, she was used as a barge. In August of that year her stem was injured by collision with a dock, and she was repaired in that regard. In March, 1899, she was overhauled to some extent by one Deibert, who states that, although he never went inside to look at the timbers, her planking was good; that he "caulked her all over; searched her all over the bottom; done everything that was necessary to do to the boat to make her seaworthy on the bottom." In January, 1900, her boiler was removed, and, the keelson beneath the boiler having been burned, three new keelsons were put in, and her deck repaired. Long, who made these repairs, testified that "she was then in pretty fair condition for an old boat." From this time to the time of the accident nothing was done to her, save as stated by Long, as follows:

"By Mr. Macklin: Q. Did you see the barge after that time? A. Yes, sir. Q. When? A. In July. He had a little of the house broke. She went to the Standard Oil Company, and on the way down she staid to my place. and I put two or three men—I don't remember which—to fix the house, and she went on to work again. Q. Did you examine her condition then? A. Yes; we went over her top, and wherever her butts wanted caulking we put it in. Q. Did you go in the hold? A. Yes, sir. Q. What was her condition? A. Seaworthy condition. Q. What time did she leave your place in July, 1900? A. I think about the 10th. Q. Was she in leaking condition then? A. No; no leaking. That was in July, 1900."

She was not taken from the water at this time. When the barge was examined after the accident, certain defects were found. The respondent's superintendent states that about a week after the accident he saw the barge on the dock at Staten Island; that her seams

were tight on the port side, but more or less open on the starboard side; that her forward deck had been out forward, where it was open and exposed to the weather; that her sheathing had come off, from being sunk; that her planks were all good, except on the starboard side, where there was some oakum out in some places, and in one or two planks there was quite an opening, caused by one of her planks being sprung.

Mutteen, a surveyor and adjuster for purposes of insurance, called by respondent, testified that he examined the barge August 13th, after the accident, at McWilliam's yard, Staten Island; that her seams were opened up a little; that one starboard plank, otherwise perfectly good, length 14 to 20 feet, was sprung outward its whole length, by reason of the spikes having partially dropped; that some oakum was left both in the open seams and at the sprung plank; that the oakum on the port side was fairly good; that the plank, in his opinion, was sprung by collision with the dock, and not from resting on the bottom; that he did not examine the fastenings of the sprung plank; and that he did not go inside the boat. This description of the vessel after the injury is corroborated by Mitchell, her captain, who also stated that after her repairs in January, 1899, she was "in good seaworthy condition,—splendid planking on her,"— and that she did not leak more than is proper for a vessel in good condition, up to the time of the accident; that the plank which sprung out was driven back into its place with new spikes. It is the opinion of this witness that the springing of the plank was caused by her striking the dock, rather than by the subsequent movement of the barge. He states that it was impossible to strike the hull of the boat against the dock, but his theory was that "the guards struck that spile in such a position that when she settled and came back with the rebound of that swell it must have strained the planks; the hull couldn't do it; the hull can't strike the dock; it is protected by the overhang, the same as a ferryboat"; that the plank could not have struck the spiles, and have been thus started, but that the "guard struck the dock, and strained the hull there." He also states that the plank was only sprung off the length of about two timbers of the boat; that it was sprung sufficiently so that he could place his finger along in the seam. The witness also states that all the time that he was on her she was never out of the water, and he was with her as captain from September 5, 1899, down to the time of the · accident. Deibert, the shipwright, also saw her in August after the accident, and states that the plank on the bottom, on the starboard side, was sprung off on one end, and that the seams were more or less open on the starboard side, but that they were good on the port side, and that he made the repairs by jacking up and fastening the plank without removing it. He said that her seams were made good by caulking, and that the planking was good. This witness agrees with the captain that the plank did not strike anything, but that from the swells of passing vessels the guards struck up against the dock, and the strain thereby induced caused the planks to spring off,

In behalf of the libelant certain evidence was given by persons who examined the barge after the collision. Ward, the shipwright,

examined her in August at Staten Island, looking her over inside and out. He states that he "would call her an old, worn, and weak vessel"; that he saw "the outside planking loose in spots, and the seams large in places, and, judging from the outside appearance, I believe the fastenings were corroded away"; that he examined the fastenings inside, and saw the ceiling drop right out of its place with the need of fastening, but that he could not see the fastening on the inside of the vessel; that he saw "a large seam about amidships on the starboard side,—a very large seam,—water spouting right out of it." This witness did not think that the injury could have been caused by striking against the dock, from the swells of passing vessels, provided the barge was in good condition. Henry Salter, inspector for marine insurance companies, first saw the barge at the dock in Newark a day or two after she sank, and several times thereafter, and also after she had been raised and taken to Staten Island and put on the dry dock. He states that he examined her inside and out; that her seams were unusually large; that there were quite a number of short pieces in her planking; that he saw the seam on the starboard side to which Mr. Ward testified, and that the seams on that side were rather large to be good caulking seams; that he took the steel point of his umbrella, and poked it into the seams, not only on the starboard side, but on the port side; that there were two butts at the bow on the port side where the point of the umbrella went into the timber. This witness states that the open seams which he saw could not have been caused by the surging and striking against the dock from the swell of a passing steamer. He says that he looked the bottom of the boat over most carefully, and did not find any marks to indicate that it had come in contact with any substance or pile to cause the leak. A memorandum made by him after his inspection states that he saw "two planks on the bluff of the port bow, and one on the starboard bow, which appear to have been broken. They are of oak. There are several butts in four places along the turn of the bilge, especially aft on each side the seams are very open; in fact, there is no oakum to be found in them in half a dozen places." He states that he did not find any rotten planks.

It is claimed on the part of the respondent that some of the injuries noticed by its own witnesses, and also by the witnesses for the libelant, were caused by the action of the water after the boat sank, or from her being drawn from her position on the bottom after she was sunk. Undoubtedly the disturbance of the vessel after she sank tended to increase any defects which she might have, but the evidence shows with sufficient clearness that the sprung plank was disturbed so as to allow the vessel to leak before she sank. This plank sprang out because the spikes drew out under some strain. There is no evidence of the cause, or, if so, it was a cause incident to, and never absent from, ordinary navigation in rivers and harbors. It is claimed on the part of the respondent that the swells of passing steamers threw the barge up against the dock with such force as to cause her to spring a-leak, the river at that point being about 600

fect wide. But she had been lying at that dock on numerous occasions from time to time for some years, and no passing steamer had caused her, or any other vessel lying there, to leak before, although lines had been broken by such swells. Kane, the man who was watching her, testified that the steamers passed that night rapidly, as usual, but no more rapidly than customary, nor is there any evidence that the conditions on that occasion were different from those theretofore existing. It is also suggested that some object may have struck against the side of the steamer, and caused the injury. All these theories are the merest speculations, not based on even the slenderest known fact. The only question, therefore, is whether the respondent has shown the vessel to be in such a seaworthy condition at the time of the accident that it must be necessarily inferred that some excepted cause, without the usual perils of navigation, brought about the injury. The Compta, 4 Sawy. 375, Fed. Cas. No. 3,069; The Emma Johnson, 1 Spr. 528, Fed. Cas. No. 4,465; The Vivid, 4 Ben. 319–323, Fed. Cas. No. 16,978. Vessels ordinarily seaworthy withstand the swells of passing vessels, and this barge did not. The inference is that she was not seaworthy. If upon this occasion she was not equal to the strains successfully withstood by other vessels lying at that dock, the inference would be that she had become weakened and was in need of repairs. What other vessels met without injury caused her to sink. The swells were nightly present; their influence was known; they were the usual, common accompaniments of navigation. The respondent's barge, to be deemed seaworthy, should have been able to withstand them. The Northern Belle, 9 Wall. 526, 19 L. Ed. 748. She was an old boat. She had survived the use for which she had been constructed, and been rehabilitated for purposes of a freight barge, and it was the duty of her owner to give her the attention that vessels of her age and decrepitude require. She had not been thoroughly examined and overhauled since the respondent first repaired her, and her bottom had not been examined for several months before the accident. The presumption is, from her sinking, that she was not seaworthy, and the court is unable to discover sufficient facts overcoming this presumption. Therefore the respondent must be held not to have discharged the burden which rests upon it, of showing that she was seaworthy against ordinary conditions. This conclusion renders unnecessary a consideration of the question of the insurance.

There should be a decree for the libelants for their damages, with costs.