COLUMBIA DREDGING CO. v. SANFORD & BROOKS CO., Inc.

(District Court, E. D. Virginia. July 3, 1908.)

SHIPPING—CHARTER—HIRING OF SCOWS—LIABILITY FOR REPAIRS.

Libelant furnished a tug and three scows to respondent to be employed in certain dredging work at a stated hire, the contract providing that respondent should keep the scows in as good repair as when received, and return them in like condition, ordinary wear and tear excepted. When the scows were tendered, respondent objected to their condition, and they were extensively repaired by libelant to fit them for the work on completion of which repairs they were accepted and the hire commenced.

Held, that respondent could not charge libelant with the cost of repairs made on them thereafter without libelant's knowledge or consent or with the time lost while so laid up; such repairs either being such as respondent was required to make under its contract or structural changes made for its own advantage.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 151.]

In Admiralty. Suit to recover for hire of tug and scows.

Henry R. Miller and Nat. T. Green, for libelant.
Hughes & Little, for respondent.

WADDILL, District Judge. This case is now before the court upon exceptions to the report of Commissioner John B. Jenkins, to whom the same was referred by decree of April 3, 1906, for the purpose of stating the accounts between the parties, respecting the transactions set up in the libel and cross-libel filed herein.

The case is briefly: The Virginia Dredging Company, under whom libelant claims by assignment, on or about the 24th day of May, 1904, contracted to hire the tug E. J. Codd and three scows, Nos. 9, 10, and 11, to the respondent Sanford & Brooks Company, Incorporated, to be used in carrying out the contract between the latter company and the United States government for cutting off Hospital Point, in the Elizabeth river, Norfolk, Va. The respondent contracted to pay as hire for the tug the sum of $1,262 per month, and also to furnish coal for it, the libelant to furnish the crew. Respondent likewise agreed to pay hire of the scows at two cents per cubic yard, government measure, per day, except Sundays. At the time of making the contract, the tug and scows were at New London, Conn., and were to be delivered as soon as practicable to the respondent at Norfolk, Va., and respondent agreed to pay $600 on account of the towage of the plant to Norfolk. The transfer was regularly made, and the tug and scows turned over to the respondent in the month of May, 1904, and continued in its service for some 14 months, with the exception of the tug, which was burned on the 2d of December. The libel in this case is filed to recover an alleged balance of $2,426.99 for hires of the plant, and also to recover the further sum of $1,822.58, with interest from October 18, 1905, alleged to have been expended by the libelant in repairing the scows upon their redelivery to libelant in Norfolk, at the termination of the work, in order to put them in the condition in which they were when delivered to the respondent at the commencement of the work, reasonable wear and tear excepted. The respondent filed a cross-libel, in which it denied all liability for the $1,822.58, and insisted that, instead of owing anything to libelant, the libelant was indebted to them as follows: (a) For repairs placed upon the scows, $1,831.98; (b) for time lost for scows being repaired, $1,922.60; (c) for time lost by tug and expenditures made for tug hired in lieu of the E. J. Codd, $694.63. The commissioner allowed the libelant the full amount of $2,426.99, balance due on the hiring, and entirely rejected the libelant's item of $1,822.58 for expenditures for repairs made upon the scows after their return by the respondent. He also disallowed entirely item "c" of libelant's offset, allowed on

account of item "b" $1,610.36, and all of item "a" of the offset, making the account as thus passed upon by him stand as follows:

Due libelant on account of hiring.................................$2,426.99
Due respondent for repairs............................$1,831.98
For loss of time while scows being repaired............. 1,610.36
                                                        _____
                                                          $3,442.34

—leaving a balance due by libelant to respondent of $1,015.35, with interest from June 1, 1905, as an excess of the claim proved by the respondent over the claim of the libelant. It is as to the correctness of these findings of the commissioner that the court has to decide. The respondent has not excepted to the commissioner's report, and hence no ruling is necessary as to the rejection of item "c" of its counterclaim, or of the reduction made in item "b," or to the allowance to the libelant for the hire of its plant, and leaves only necessary for consideration the propriety of his rulings, first, in rejecting the libelant's claim of $1,822.58 for repairs to the scows after their return; second, for the allowance of $1,831.98 to the respondent for repairs done upon the scows pending the work, and of $1,610.36 for loss of time while the repairs were being made on the scows.

The conclusion reached by the court is that the commissioner was right in rejecting the claim of libelant for $1,822.58 for repairs made on the scows after their return, and that the exception to his report in that respect should be overruled. It is true that the libelant spent this sum before again putting them in commission, but it does not necessarily follow that the respondent had not reasonably complied with its undertaking to keep them in as good repair as when received, ordinary wear and tear excepted. Certain it is that the libelant should have had this question settled at the time the scows were returned, and not have received them and made the repairs without notice to the respondent. The allowance to respondent of the sum of $3,442.34 for work done upon the scows pending the progress of the work, and for loss of time while such repairs were being made, presents for the consideration of the court the true meaning of the agreement under which these scows were hired, and whether or not the particular work charged for was what respondent, and not the libelant, should have done, and, if the libelant is responsible at all, whether the liability extends to all of the repairs in question, and whether the charges for loss of time incident to the work are reasonable. The court is quite clear that the libelant is in no manner liable for repairs of a structural character upon the scows found by the respondent during the progress of the work, to be desirable for its particular business in hand, and the court is likewise clear that the allowance of $1,610.36 for loss of time of these scows while putting $1,831.89 of work upon them is unreasonable. Sovereign of the Seas (D. C.) 139 Fed. 812. Should an allowance be made at all on account of these items of offset, that made on account of repairs should be modified so as to exclude the cost of the structural changes aforesaid, and the allowance for lay-off during the repairs and changes should be materially reduced. A striking illustration of this is found in the charge of $873.12 for 51 days' loss of work on scow No. 10 at $17.12 per day, whereas

the cost of the work covering the same period was $9.12 per day, aggregating $465.04; in other words, an allowance of 51 days to do $465 of work, and charging for such time $17.12 per day for the layoff of the vessel, giving the respondent a handsome bonus for keeping the scow in the repair shop, instead of in the water. No formal charter party was entered into between the parties for the hiring of the plant, and what was the real undertaking between them can only be ascertained from the correspondence on the subject, in the light of the verbal explanations made by the actors of what occurred at the time of the transaction in question. In the letter of 23d of April, 1904, from respondent's vice president to the president of the libelant company, it is said:

"Confirming our conversation of this morning over the long distance phone, beg to state that we agree to take your tugboat E. J. Codd at $1,200 per month, we to furnish coal, and your three scows, Nos. 9, 10 and 11 at 2¢ per cubic yard per day on government measurement, it being understood that we will keep the scows in as good repair as they are when received and return them in like manner, ordinary wear and tear excepted. It is also understood that you should deliver these scows and tugboat to us at Norfolk as soon as it is practicable to do so, and you are to pay $1,400 for towing them from New London, Conn., to Norfolk, of which amount we agree to pay $600, provided we keep the scows for six months or longer; or if you require the use of them sooner that we are to pay $100 of the $600 for each month that we keep them—that, if we keep the scows one month, we would pay you $100 of this tow bill. If we keep them three months, we pay you $300 of this tow bill, and so on. You have the privilege of taking them back at any time by giving us reasonable notice that you want them. By reasonable notice we understand that you would give us ten days' notice. Of course, we should prefer a longer notice if convenient for you to give it to us."

A change was made from $1,200 to $1,262 for the hire of the tug in subsequent correspondence, and it was agreed that the respondent would retain the plant, unless libelant called for its return, upon notice as contemplated in the letter above, during the period of the government work in removing Hospital Point, and the question of libelant's having the scows properly treated with a view of preventing destruction from worms was considered and agreed upon. The language of this letter, which embodied the substance of the understanding between the parties, seems too plain to admit of serious doubt. It clearly contemplated the delivery to and acceptance of the plant by the respondent in a "seaworthy" or what might be more properly described as stated by respondent's witness McCoy, a shipbuilder, a "good working condition for the work they were to do there," meaning the removal of mud from the cut off in question, within the harbor of Norfolk. This plant was brought down from New London to Norfolk, and turned over to respondent's representatives; but the question of the condition of the scows was raised, and fully considered before their formal acceptance, and the libelant spent some $3,000, and as much as $1,500 on a single scow, being scow No. 10, to place them in satisfactory condition for the work in hand, and, with a view of arriving at an understanding as to the delivery and acceptance of the scows, a meeting was held between the parties in the city of Baltimore on the 23d of May, 1904, at which the matter was settled, and, to the end of having no misunderstanding, the vice president of the respond-

ent then and there addressed to the president of the predecessor of the libelant the following communication:

"Dear Sir: Referring to our interview to-day, we understand the following to be the result: We agree to pay you for tug Codd $1,262 a month instead of $1,200. In regard to the scow hire, we agree to pay you for the yardage that the scows have produced in accordance with the statement enclosed herewith, it being understood that we will not take the three scows until they are finally overhauled and turned over to us. No. 11 having been completed and turned over to us on the 16th instant, No. 9 we understand was turned over to us on Saturday last, May 21st, and No. 10 is now under repairs."

By subsequent correspondence it is shown that scow No. 10 was accepted on June 21, 1904.

The repairs charged for, and which form the subject of the exception under consideration, were all made subsequent to this final acceptance of the scows, and at periods covering from one to five months thereafter, and in the opinion of the court the changes are made up chiefly of such items of repairs as became necessarily incident to the working of the scows, or of improvements rather of a permanent character in the structural make-up of the scows which respondent saw fit to make for its own convenience, and the better handling of the same. Manifestly improvements of the latter kind could not be made at libelant's cost, and without its knowledge and consent, and those of the former class were clearly such as the contract of hire contemplated the bailee should make. Whether it be that the understanding between the parties meant that the scows should be in a "seaworthy" or in a "good working condition for the work they were to do there," this condition evidently had relation to the time of their acceptance, and not that they were always to remain so during the indefinite period of· the hire, and that they were to be so maintained by the libelant. Such a view is not only inconsistent with the plain terms of the undertaking, but at variance with everything that was done. Had that been the idea of the parties, the question of the condition of the scows at the time of acceptance would have been utterly immaterial, as the respondent would simply have had to lay off the scows for repair at libelant's expense. The letter last copied of May 23, 1904, contains this significant language:

"It being understood that we will not take the three scows until they are finally overhauled and turned over to us."

And in the first letter above copied of April 23, 1904, is this provision:

"It being understood that we will keep the scows in as good repair as they are when received, and return them in like manner, ordinary wear and tear excepted."

The repairs and improvements charged for being either of the kind for which libelant should not be held responsible, or of the character that respondent, and not the libelant, should have made, the exceptions to the commissioner's report allowing $1,831.98 therefor and $1,610.36 for loss of time of the scows while repairs were being made, should be sustained, and from this it follows that a decree should be entered in libelant's favor for $2,426.99, instead of $1,015.35 in favor of re-

spondent, with interest from June 18, 1905. This would at least seem to be more in keeping with the meting out of justice between the parties. To sustain the report would be to allow ·the respondent who chose to retain the scows in his possession to get them free of rent to the extent of the amount sued for of $2,426.99, to have a decree over against libelant for $1,015.35, and the latter to lose, in addition, the sum of $1,822.58 found necessary to be expended to put the scows in working condition at the time of their return.

The court is not unmindful of the weight that should be given to a master's report, but cannot see its way clear to follow the conclusions reached in this case, as the same are, in the judgment of the court, plainly erroneous, and hence should not be adopted. The Carib Prince, 170 U. S. 655, 658, 18 Sup. Ct. 753, 42 L. Ed. 1181; The Wildcroft, 201 U. S. 378, 387, 26 Sup. Ct. 467, 50 L. Ed. 794; The Sappho, 94 Fed. 545, 36 C. C. A. 395.

A decree may be entered carrying out the views herein expressed.