## THE TRANSIT.

### (Circuit Court of Appeals, Third Circuit. April 4, 1918.)

#### No. 2338.

1. SHIPPING ☞42—CHARTER—WARRANTY OF SEAWORTHINESS.

Though a charter of a vessel for 30 days was a demise, and was entered into after a more or less thorough inspection by an agent of the charterer, the owner was not relieved of his implied warranty as to seaworthiness concerning a defect in the rudder port sleeve and in the timbers concealed by it, for the rule of caveat emptor applies only to defects which are patent or are discoverable on inspection.

2. SHIPPING ☞58(2)—PRESUMPTIONS—UNSEAWORTHINESS.

A presumption of unseaworthiness arises, and alone will sustain a recovery, where a vessel sinks from an unknown cause, under circumstances where she had been subjected to no external peril, and nothing but her unseaworthiness can explain the accident.

3. SHIPPING ☞58(2)—SINKING OF VESSEL—EVIDENCE.

On a libel to recover damages for injury to the cargo of a lighter, which sank at her dock, evidence *held* insufficient to show that the sinking was the result of the vessel's unseaworthiness.

Appeal from the District Court of the United States for the District of New Jersey; J. Warren Davis, Judge.

Libel by the Atlantic Lighterage Corporation against the steam lighter Transit, her boilers, etc., claimed by Royal L. Sidnam. From a decree dismissing the libel, libelant appeals. Affirmed.

Meyer Eichman, of West Hoboken, N. J., and Foley & Martin, of New York City (William J. Martin and George V. A. McCloskey, both of New York City, of counsel), for appellant.

Macklin, Brown & Purdy, of New York City (William F. Purdy, of New York City, of counsel), for appellee.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

WOOLLEY, Circuit Judge. The steam lighter "Transit" sank at her dock early on the morning of September 12, 1916. The charterer, as bailee of the cargo, filed this libel to recover damages for injury to the cargo. The District Court dismissed the libel. The libelant appealed.

The action was brought on the warranty of seaworthiness implied in the charter, Work v. Leathers, 97 U. S. 379, 24 L. Ed. 1012; the libelant alleging that the vessel was unseaworthy and that her unseaworthiness caused her to sink. The claimant admitted the warranty but denied liability upon the ground that the charter was a demise of the vessel, and that, in a charter of demise, the rule of caveat emptor applies and relieves the owner from the warranty as to defects in the vessel. The claimant defended also upon the ground that the vessel was not unseaworthy and that she did not sink because of unseaworthiness.

In sustaining its charge, the libelant relied upon the presumption of unseaworthiness and also upon evidence of unseaworthiness.

The area of this controversy may be narrowed by disposing briefly of two of its phases.

[1] There is no substance in the claimant's defence that the charter was a demise, and, therefore, the owner was relieved of the warranty of seaworthiness by the rule of caveat emptor. Sanford & Brooks Co. v. Columbia Dredging Co. (D. C.) 163 Fed. 362; Id., 177 Fed. 878, 101 C. C. A. 92. Manifestly, the charter was a demise, following a more or less thorough inspection by an agent of the charterer. Scanlan v. The Deck Scow Johnson Lighterage Co. Nos. 15 and 24, 248 Fed. 74, —— C. C. A. ——. But the rule of caveat emptor applies to a charter of demise (and to the discharge of the owner's implied warranty of seaworthiness) only as to defects in the vessel which are patent or which are discoverable after inspection or after an opportunity to inspect. The defects in this vessel, being in its rudder port sleeve and in the timbers concealed by it, as was afterward discovered, were hidden and were not discoverable upon the inspection that was made or upon such an inspection as reasonably should be made on entering into a thirty day charter, and, therefore, the rule of caveat emptor can not be invoked to the relief of the owner on his warranty of seaworthiness.

[2] Nor do we think there is substance in the libelant's claim to recovery on the presumption of the vessel's unseaworthiness. Such a presumption necessarily arises and alone will sustain recovery in a case where a vessel sinks from an unknown cause under circumstances where she had been subjected to no external peril, and where nothing but her unseaworthiness can explain the accident. In other words, the presumption of unseaworthiness arises where the only inference in the circumstances is that of unseaworthiness. The Loyal, 204 Fed. 930, 123 C. C. A. 252; The Willie (D. C.) 134 Fed. 759; Sanbern v. Wright & Cobb Lighterage Co. (D. C.) 171 Fed. 449; Id., 179 Fed. 1021, 102 C. C. A. 666; Oregon Round Lumber Co. v. Portland & Asiatic S. S. Co. (D. C.) 162 Fed. 912; Forbes v. Merchants' Exp. & Transp. Co. (D. C.) 111 Fed. 796; Id., 120 Fed. 1019, 56 C. C. A. 681. As the circumstances attending the sinking of the "Transit" do not exclude all inferable causes except that of unseaworthiness, but, on the contrary, very plausibly suggest another cause, the presumption does not exist.

[3] The case, therefore, presents the single question: What caused the vessel to sink?

The "Transit" was a steam lighter of about 175 tons burden, built and rigged to carry miscellaneous cargo, and was engaged in lighterage service in New York Harbor under charter to the libelant. At about 5:30 o'clock on the evening of September 11, 1916, the vessel docked at Pier 29, North River, bow in, with her starboard side against the pier. She was heavily laden aft, her freeboard at the stern being only twenty to twenty-two inches, while at the bow it was from four to five feet. Her lines were such that when so loaded, and when

resting on an even keel, her freeboard amidships was less than at the stern.

At about 6 o'clock the captain and crew went ashore, leaving the engineer in charge for the night.

If there was negligence in so loading and in so leaving the vessel, it was the neglience of the libelant's servants.

The vessel made water more or less at all times, taking in more when loaded than when light. She carried three siphons and one pump, but seldom had occasion to use more than one siphon. During the night in question, the engineer pumped her "dry" three times (that is, he lowered the water beyond the reach of the siphon), pumping about one hour each time and concluded at the hours of 9 P. M., 12 M., and 3:30 A. M. respectively. He was awakened at about 4:30 A. M. by the water rushing into the hold from the starboard coal bunker deck opening. Upon going hastily on deck, he found that the vessel had a list toward the pier, that her starboard rail was under water, and that the water was about a foot deep on the starboard deck amidships. He attempted to close the starboard coal bunker hatch into which the water was flowing, but failing, the vessel filled rapidly and sank.

The vessel was afterward raised, and, upon being put into dry dock, was subjected to several surveys. These disclosed a leak in her side (which was of no consequence) and that the lead sleeve, designed to keep water from entering the seams of the rudder port, was badly worn, and that the seams in the rudder port were open, permitting water when driven from a hose from within, to flow out in streams of varying sizes. Witnesses for the libelant testified, that, under the greater pressure upon the vessel when in the water and down at the stern, water would flow in in quantities sufficient to sink her, and that, in the opinion of some of them, the defective condition of the rudder port and its sleeve amounted to unseaworthiness and was the cause of the vessel sinking.

The counter testimony of the claimant tended to prove that the admittedly defective condition of the rudder port of the "Transit" was not unusual in vessels of her age and build; that it did not amount to unseaworthiness and did not cause the vessel to sink; but, that she sank through a cause that had no relation to the rudder port or to its condition.

Upon the first point it was testified for the claimant, that water, when directed against the rudder port by a hose from within, seeped through many places and flowed freely through several places in streams varying in size from that of a spike hole to that of a nail hole, and that all the water, if brought together, would make a stream no greater than from one to one and one-half inches in diameter; that gauged by the time actually required to fill the vessel's water tanks from a two and one-half inch hose under city pressure, and by the lowering of the vessel an inch or two in the operation, as shown by experience, the vessel could not be sunk by the quantity of water that would come through the rudder port leaks in one hour, but that it would take anywhere from a whole night to several days for enough water coming through the leaks to sink her.

This testimony, considered with reference to the interest of the witnesses and the manner in which it was delivered, is, without other considerations, persuasive that the vessel did not sink because of the inflow of water through the seams of the rudder port. But there are other facts in the case which are not compatible with the libelant's theory that the vessel sank by filling from the rudder port leaks. These concern the claimant's theory of the sinking.

From evidence that was not disputed or else was decidedly preponderating, the following facts were established: The pier to which the "Transit" was moored had a number of fenders arranged along its side. Each fender was made up of a cluster of piles, standing out from the pier, to which heavy oak planking, vertically arranged, was bolted. The planking was sawed off about two feet above low water.

The vessel was docked in the evening on the flood tide, with her midship directly opposite a fender. It was low tide at 2:32 A. M. at Governors Island. Slack water lasted but a little while, the tide turning to flood at the pier at about 3 A. M. The guard of the vessel amidships was sufficiently low to move under and be caught by the overhang of the fender at low water. The tide on the turn to flood tended to set the vessel against the pier. Within one and one-half hours after low water (and within one hour after she had been pumped out), the vessel had a list toward the pier as though caught by a fender and held there against the rising tide; the starboard rail, which was twelve inches above the deck, was under water; the starboard deck was awash; the port rail was high out of water; and water was running down the starboard coal bunker hatch in considerable volume and with sufficient force to wash the coal out of the bunker. (The coal in the port bunker was found undisturbed.) The vessel thus filled and sank, but in sinking she moved against the set of the tide and in the direction of the list of her hull and finally came to the bottom on an even keel six or eight feet away from the pier.

The claimant maintains that the proper inference from these facts is that the vessel sank, not by filling from leaks in her rudder port, but by being caught and held by a pier fender against the rising tide until she listed and filled. On being raised, the vessel showed no marks of contact with the fender bottom. This, however, was spongy or slimy.

No one knows what caused the vessel to sink, for no one saw the cause operating. The cause, therefore, must be inferred from the facts. The dominant facts are two: First, that the vessel leaked; second, that she listed. The certain inference is that she filled in consequence of one or the other. Aside from the testimony bearing directly on the question of the size and the effect of the leaks, which, as we have said, inclines against the libelant, the fact of the vessel's list is wholly incompatible with the theory that she filled from leaks. The leaks were in the rudder port, through which the water seeped and flowed into the bilge. As openings from the hold into the bilge were at all times maintained on each side of the keelson by keeping off eight inch planks, water leaking into the bilge would naturally pass through the bilge openings and rise gradually in the hold, seeking its own level, and would cause the vessel, not to list, but, gradually to sink on an

even keel without sweeping the coal from the starboard bunker and without changing her position with reference to the pier. But the fact is, she did not fill gradually from below, but, having listed, she filled rapidly from above, and sank six or eight feet away from her original position.

The trial judge found that the vessel sank by reason of a pier fender catching the vessel, listing her, and holding her down against a rising tide. This conclusion is fairly inferable from the facts. But, whatever may have been the cause of the vessel sinking, we are satisfied from the evidence that it was not unseaworthiness due to the leaky condition of her rudder port. As the libel charges unseaworthiness as the cause of the sinking, and as we have found that the charge has not been sustained by the evidence, we affirm the decree of the trial court dismissing the libel.