## THE JUNGSHOVED.

(District Court, S. D. New York.   April 5, 1921.)

**1. Shipping ⧠⟿42—Implied warranty of seaworthiness of chartered barge.**

Where the owner of a ship's cargo of coffee in bags applied to a firm of brokers for barges on which to discharge a part of the cargo, there was an implied warranty by the brokers not disclosing that they were acting as such, that each of the barges furnished was seaworthy and fit to sustain and carry the weight usual for boats of her size and kind.

**2. Shipping ⧠⟿42—Charter demise carries implied warranty of seaworthiness.**

Under an oral demise of a barge for a specified use, there is an implied warranty that she is seaworthy and fit for the intended use except for patent defects.

**3. Shipping ⧠⟿22—One letting barge without disclosing ownership liable for its unseaworthiness.**

A brokerage firm which was also the owner of barges, which chartered three barges to libelant for use in discharging a ship, *held* liable for a loss caused by the unseaworthiness of one of the barges, though it was not the owner of that barge but let it as agent for the owner, where libelant was not notified of the fact that the lessors were acting as brokers.

**4. Principal and agent ⧠⟿145(4)—May be held jointly liable for breach of warranty of seaworthiness of vessel.**

In a suit in rem against a vessel under charter for failure to deliver cargo, which was lost by the sinking of an unseaworthy barge hired by the charterer for use in discharging the ship, the charterer *held* entitled to bring in both the broker from whom it hired the barge and its undisclosed owner, for whom the broker acted as agent, and to a joint and several decree against both for breach of the implied warranty of seaworthiness of the barge; for the doctrine of election is not applicable, as the wrong sounds in tort as much as in contract.

**5. Shipping ⧠⟿104—"Carriage" does not necessarily involve movement of vessel.**

"Carriage" includes ability to lift a cargo and hold it afloat, and does not necessarily involve any translation of the vessel from one place to another.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Carriage.]

In Admiralty.   Suit against the steamship Jungshoved, Funch, Edye & Co., charterers, with C. F. Harms & Co. and Alice B. Croasdale impleaded by charterer.   Decree for libelants against all respondents.

This proceeding was started by a number of libels in rem against the steamer Jungshoved, for failure to deliver 4,608 bags of green coffee in accordance with libelants' bills of lading.   The Jungshoved at that time was under charter to Funch, Edye & Co., and the loss occurred while the charterers were discharging.   The pier at which the ship lay was greatly crowded on January 24, 1917, and in order to obtain storage space it became necessary temporarily to discharge some of the coffee upon barges alongside.   Two of these barges, obtained by employees of Funch, Edye & Co. from the respondents, C. F. Harms & Co., brokers and owners, turned out to be seaworthy.   The loss occurred because of the unseaworthiness of the third barge, Crown, likewise procured from C. F. Harms & Co. and owned by the respondent Alice B. Croasdale, who had left her under the control of the brokers to let out on commission.

The charter was oral, and was made by one Zeller, an employee of C. F. Harms & Co. acting for them, and by either Fleet or Christenson, acting for Funch, Edye & Co.   That question is in dispute.   There was also a

dispute as to what the terms of the oral charter were, Zeller saying that Fleet, with whom he dealt, asked for a barge to lift 4,000 bags of coffee, and that he assented provided the cargo was no greater. Christenson, who Funch, Edye & Co. say acted for them, swore that there was no limitation as to cargo.

The stevedores loaded the barge through the night, and at about 8 o'clock in the morning of the 25th without warning she sank. It was proved beyond question that she was not seaworthy for the tonnage stowed upon her, and it was also proved that a new barge of her size if seaworthy should successfully lift more than the number of bags actually stowed. The barge was some 15 years old and on being raised proved to be not worth the cost of her repairs.

Funch, Edye & Co., the charterers of the Jungshoved, by petition under the then Fifty-Ninth Rule in Admiralty (29 Sup. Ct. xlvi), brought in the brokers, Harms & Co., and the owner, Croasdale. The ship acknowledged judgment to the libelants, and the substantial issues litigated were of the liability over of Harms and Croasdale to Funch, Edye & Co. in exoneration of their liability as charterers to the ship.

Roger H. Loughran, of New York City, for libelants.

Roscoe H. Hupper, of New York City, for the Jungshoved and Funch, Edye & Co.

Horace L. Cheyney, of New York City, for C. F. Harms & Co.

Pierre M. Brown, of New York City, for Croasdale.

LEARNED HAND, District Judge (after stating the facts as above). The first question in this case is one of fact: What was the contract of hiring between Funch, Edye & Co. and C. F. Harms & Co.? I think that Christenson called up Zeller and merely asked for a lighter, and that Zeller said nothing about any limitation in her capacity. This I conclude in spite of the fact that Christenson was not clear in his memory of what he said and was mistaken in his recollection of the price to be paid, and that Fleet was unsatisfactory in his denials. This vagueness of both seems to me to be rather an index of honesty than otherwise. On the main point Christenson was clear, i. e., that there was no limitation of the loading capacity.

As against this I cannot accept Zeller for several reasons: First, it seems to me nearly impossible that Fleet should have told him that he had 4,000 bags to load when he could not have known how many he would have, and when in no event could 4,000 have been a number in his mind. Next, I cannot fail to regret that Zeller should have destroyed the written memorandum of his talk made the very next day and after the trouble had arisen. Finally and chiefly, the correspondence between the parties on the 25th and 29th of January, and on February 1st, effectively precludes any such supposition. On the 25th Funch, Edye & Co. wrote to Harms notifying them of the loss and that they would be held responsible. In that letter they stated the number of bags stowed, 4,608, thus advising them clearly of the putative overloading. Harms answered on the 29th excusing themselves because they were agents, but not noticing the violation of the contract, which Zeller not only knew, but says that he had actually called to Fleet's attention on the 25th. On the 29th, Funch, Edye & Co. repeated its claim and insisted that Harms was liable. On February 1st, Harms replied in an answer which seems to me conclusive:

"When you asked us to get boats for you we quoted you a price for the boats at so much a day same (sic) as we have done in the past."

Again:

"We told your representative when he asked us to secure boats for your company that we would do what we could to get them."

At the time they knew that Funch, Edye & Co. would not be content with their disclaimer of responsibility, and meant to press them for a recovery. It is inconceivable that they should have kept back a complete defense to the whole claim if they knew of it. Zeller's excuse is trivial. He says he did not wish to injure Fleet by a disclosure. Yet he must disclose the fact to the owner or be guilty of a gross breach of faith, which he repudiates. Unless Funch, Edye & Co. was to be put off with no excuse, Fleet would be uncovered in the end, and that, too, deservedly. The occasion was not trifling; some $70,000 worth of coffee had been lost, and it is merely preposterous to suppose that Zeller was so tender of Fleet at such a cost, and that too by a concealment which would not in the end protect him, had he wished to do so. I conclude that Zeller's present recollection is at fault and that the barge was let without limitation.

[1] This being true, the implied warranty of seaworthiness was broken. It means that the barge was reasonably fit for the purposes for which she was intended. The Silvia, 171 U. S. 462, 19 Sup. Ct. 7, 43 L. Ed. 241; The Southwark, 191 U. S. 1, 9, 24 Sup. Ct. 1, 48 L. Ed. 65. As applied to this case the warranty meant that the Crown was reasonably fit to carry a cargo usual for boats of her size, which was 300 tons or more. She was obviously not so fit, and it was her unfitness which caused the loss. The person making the warranty is therefore responsible.

[2, 5] Various excuses are made: One, that the barge was hired for storage and not for carriage. There is no basis whatever for this assertion, not even under Zeller's story. Funch, Edye & Co. simply asked for a lighter and got one. That she was to be used for storage is true, but under the charter she could have been moved hither and yon within the slip or outside, as she might well have been in fact, had she floated. But in any case it is a novel proposition that an owner may furnish an unseaworthy boat because she is to be kept at anchor. "Carriage" includes ability to lift a cargo and hold it afloat, and does not necessarily involve any translation of the vessel from one place to another. Next, it is said that in the case of a demise there is no implied warranty but the charterer takes caveat emptor. This may be true where the defect is patent and the charterer has had an opportunity to examine the vessel (Sanford, etc., Co. v. Columbia Dredging Co., 177 Fed. 878, 101 C. C. A. 92), but it is not true when the defects are not so open (The Transit, 250 Fed. 71, 72, 162 C. C. A. 243). Either Harms or the owner or both are clearly liable for the breach of the usual implied warranty which covers every vessel which offers herself as able to carry cargo. These parties, having offered an old and unsafe barge, have no just ground of complaint that the loss should fall on them and not upon those who had the right to rely upon their barge.

[3] The only question is as to who is liable. Harms was in fact only an agent, getting a commission of 5 per cent., a very trivial amount. It may be that Fleet did in fact know that in many cases they acted only as agents, but he could not have known that they always did, because that was not the fact. Nor was there any reason in this case for him to know whether the barge belonged to Harms or to some one else. Christenson merely asked for a barge and Zeller said he would send one to him. Zeller says that he told Fleet (not Christenson) that the barge belonged to Croasdale, but I cannot accept that part of his story any more than the rest. On the 29th Funch, Edye & Co. did not know who was the owner, and Harms did not suggest that they had ever told them who the owner was. On the contrary, they begged to advise Funch, Edye & Co. that they were not the owners, a communication scarcely necessary if they had already told the owner's name at the time when the barge was chartered. On February 1st, actually referring to the oral charter, they said that they had told Funch, Edye & Co. that they would try to get a barge (not, by the way, what Zeller swore to on the stand), and again they do not suggest that they had originally told the owner's name. Then for the first time—judging from the correspondence—they told the owner's name.

The case is therefore one in which the agent without disclosing whether he is acting as an agent or not, lets a barge apparently on his own responsibility. According to ordinary rules he is liable as principal, and so far as I know there is no decision even hinting the contrary. The decision of Judge Hough in Bashinsky Cotton Co. v. Sunset Lighterage Corp., 272 Fed. 120, is cited to the contrary. In that case the facts are to be got only by inference from the memorandum, but it appears that the bargee of the owner of a barge connived with river thieves in the theft of some cotton laden by the libelant. The latter sued the broker who let the barge, and it was held that the broker merely let the barge to be used by the libelants (strictly by the libelants' own agents), in carrying cotton. This did not create a contract of carriage by the brokers or any one else, and they were not liable for the malfeasance of the bargee. At best the case goes no further than to say that the brokers, though the apparent principals, were not liable for the act of the owner's bargee, whom they did not employ, not having accepted "a carrier's liability." The case is certainly not in point here. It is true that viewed from Harms' point of view the result may seem harsh, but not so harsh as to deny to Funch, Edye & Co. any relief against the party with whom they dealt without any intimation that at least in the case of this vessel they were acting for another. Nothing was simpler than to advise them that they were merely brokers and took no responsibility. Instead, they appear to have relied upon the fact that Funch, Edye & Co. knew that they did oftentimes act as such. That is patently insufficient; indeed, it would have been insufficient even if they had advised them without "giving up" some owner's name, that they so acted in this particular instance. Had Zeller indeed said what he claims, i. e., that the barge belonged to Croasdale, the case would be different; but as I have said, Zeller's testimony is discredited in too many ways to stand.

[4] The final objection rests upon the supposition that Funch, Edye & Co. may not bring in both agent and undisclosed principal in a single petition and at the same time. The argument is that they must elect one or the other, and indeed that they have lost all rights by joining both. Obviously, they have not elected, and the most that can be now required is that they elect before interlocutory decree. It must be owned that the law is in great confusion as to when the creditor in such case must elect, reflecting, I cannot help thinking, the anomalous nature of the liability of the undisclosed principal. In New York it was held in Cobb v. Knapp, 71 N. Y. 348, 27 Am. Rep. 51, that judgment might go against one, while a suit was pending against the other. In Tuthill v. Wilson, 90 N. Y. 423, it was said obiter that the prosecution of a suit to judgment against one forbade any suit against the other. The cases in the Appellate Divisions appear to me in hopeless conflict. Thus in Cherrington v. Burchell, 147 App. Div. 16, 131 N. Y. Supp. 631, a judgment against both was reversed. In Montague, etc., Co. v. All Package, etc., Co., 182 App. Div. 500, 169 N. Y. Supp. 920, a former suit against one was not thought to be an election. In Tew v. Wolfsohn, 77 App. Div. 454, 79 N. Y. Supp. 286, a suit against both was allowed, and affirmed in 174 N. Y. 272, 66 N. E. 934, though for a totally different reason. In McLean v. Sexton, 44 App. Div. 520, 60 N. Y. Supp. 871, a suit against both was allowed, and it was apparently thought that only satisfaction from one would bar the claim against the other, the same rule as was adopted in Beymer v. Bonsall, 79 Pa. 298. On the other hand, the Circuit Court of Appeals for the Seventh Circuit in Barrell v. Newby, 127 Fed. 656, 62 C. C. A. 382, held that suits against one in which attachments had issued, barred a suit against the other.

In this confusion it would be satisfactory to be able to refer to some principle, but so far as I can see there is none, because there is no principle on which the undisclosed principal can be held in any case. Prof. Meecham, in 23 Harv. L. R. 59, in substance favors the rule in Beymer v. Bonsall, supra, while acknowledging that the authorities do not give any certain definition of what is and what is not an election.

I do not think it is necessary to commit myself to any rule of election in the case at bar, because, being in effect a suit for breach of warranty as to an existing fact, i. e., seaworthiness, the case is not properly one of contract at all, not at least in the sense that Funch, Edye & Co. accepted the credit of Harms to fulfill an engagement in futuro. Their reliance was upon the reasonable implication arising from a charter of the barge. This was not that any one would do anything in the future, but that a certain fact then existed of which Harms had the means of knowledge and Funch, Edye & Co. had not, at least not equally. Now an action upon such a warranty originally lay only in deceit or in an action on the case for deceit, and assumpsit was a questionable remedy until 1778. Stuart v. Wilkins, 3 Doug. 118. Action on the case still lay in 1802. In Williamson v. Allison, 2 East, 446, decided in that year, Lord Ellenborough said (page 451) that the modern practice of suing in assumpsit had not prevailed over 40 years. Action on the case was accepted as still permissible in this circuit as late as 1863 (Schuchardt v. Allen, 1 Wall. 359, 17 L. Ed. 642), and it might

perhaps still be so brought. Be this as it may, the history and survival of this remedy shows clearly enough that the wrong sounds in tort (The Soerstad [D. C.] 257 Fed. 130) as much as in contract. As I said in The Soerstad, supra, it consists in the loss occasioned by the plaintiff's reliance upon a fact of whose truth the defendant, personally in a better position to know, has assured him.

If so, there is no ground for the application of the doctrine of election, and no question of the liability of the agent who gives the warranty. As to the principal, liability depends upon whether the agent was at the time acting within the scope of his authority, of which there is here no doubt. The respondents answer that, so regarded, since the claim sounds in tort, admiralty has no jurisdiction. There are no forms of action in the admiralty; the warranty, though in fact a representation of fact, was part of a maritime contract. Such warranties have long been within the cognizance of admiralty, being treated as contracts, whatever under a nicer analysis they may turn out to be. To say that under that analysis they may be treated as torts does not at this late date change our jurisdiction over them.

So it seems to me that Funch, Edye & Co. may sue both principal and agent to final decree and get a single satisfaction from either or both. Croasdale and Harms have not indicated in what order they consent that execution should issue; but in the absence of circumstances, not appearing, to the contrary, the normal relation would be that the owner who furnished the unseaworthy barge should be principal and the broker surety. Unless, therefore, Croasdale show cause to the contrary, the decree will read that execution shall first go against her, and against Harms for the deficiency.

A decree will enter for the usual reference in favor of the libelants against the "Jungshoved" with costs, and on the petition of Funch, Edye & Co. against Croasdale and Harms with one bill of costs, execution to issue first against Croasdale.