## SANFORD & BROOKS CO. v. COLUMBIA DREDGING CO.

(Circuit Court of Appeals, Fourth Circuit. March 16, 1910.)

No. 857.

**1.** SHIPPING (§ 42*)—TIME CHARTERS—IMPLIED WARRANTY OF FITNESS OF VESSEL—RULE OF CAVEAT EMPTOR.

The rule of caveat emptor applies to contracts of letting as well as of sale, and the hirer of a vessel. who accepts the same after full inspection. as in compliance with the contract, cannot hold the owner to an implied warranty against defects which were then discoverable, where he could not have done so had he been a purchaser.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 42.*

Implied warranty of seaworthiness, see notes to The Carib Prince, 15 C. C. A. 388; Neilson v. Coal, Cement & Supply Co., 60 C. C. A. 179.]

**2.** SHIPPING (§ 49*)—HIRE OF SCOWS—FITNESS—EFFECT OF ACCEPTANCE AFTER INSPECTION.

Libelant hired to respondent, by a charter made verbally and by correspondence, a tug and three scows, to be used in dredging work, at a monthly rental;' respondent agreeing to keep and return them in as good condition as they then were, ordinary wear excepted. When the scows were tendered, respondent made complaint of their. condition, and refused to accept them as they were, and libelant had them repaired at a cost of $3,000. By a supplemental agreement, it was provided that the hire of the scows should commence from the time each was "finally overhauled" and accepted by respondent. They were so accepted, and were retained and used by respondent for about 14 months. During such use the dumping gear was found unsatisfactory in operation, and complaint was made to libelant, which promptly replied that it would make no further alterations or improvements, whereupon respondent had the same made. It at no time offered to return the scows, and the defects in the gear were easily discoverable at the time they were accepted. *Held.* that the defects were not such as to render the scows unseaworthy, and that respondent was bound by their acceptance after inspection and their retention, and could not set off against the hire the cost of the repairs and alterations made by it thereon.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 49.*]

**3.** SHIPPING (§ 42*)—CHARTERS—"SEAWORTHY."

To be "seaworthy" a vessel must be sufficiently tight, staunch, and strong to resist the ordinary attacks of winds and seas.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 156; Dec. Dig. § 42.*

For other definitions, see Words and Phrases, vol. 7, pp. 6362–6365; vol. 8, p. 7796.]

Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk.

Suit in admiralty by the Columbia Dredging Company against the Sanford & Brooks Company. Decree for libelant (163 Fed. 362), and respondent appeals. Affirmed.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

H. H. Little, for appellant.

Henry R. Miller and N. T. Green, for appellee.

Before PRITCHARD, Circuit Judge, and MORRIS and BRAW-LEY, District Judges.

BRAWLEY, District Judge. This is a libel to recover $2,426.99, the balance alleged to be due for the hire of a tug and three mud scows, and also to recover the further sum of $1,822.58, alleged to have been expended by the libelant in repairing the scows upon their redelivery at the termination of the work, in order to put them in the condition in which they were when delivered to respondents. This last-mentioned claim was not allowed by the court below, and, as there is no appeal by the libelant, it will not be considered.

The respondents filed a cross-libel, claiming $3,442.34 for work done upon the scows during the progress of the work, and for loss of time while such repairs were being made. There was also a claim in the cross-libel for the time lost by the tug and expenditures for another tug hired in lieu of the tug, and also a claim for certain deductions on account of holidays. These two last items have not been pressed in the argument before us, and need not be considered. The case was referred to a commissioner for the purpose of taking and stating the accounts between the parties, who reported in favor of the libelant for the amount first above stated as due upon their account, and allowed the respondents the sum of $3,442.34, the claim set up in the cross-libel adjudging that the respondents should recover from the libelant the sum of $1,015.35; that being the excess of the claim proved by it over the claim of the libelant. Exceptions were filed by the libelant, and a decree was entered by the district judge overruling the report in so far as it allowed the claims above referred to set up in the cross-libel, and a decree was entered in favor of the libelant for the amount of its claim. From that decree respondents have appealed.

In the spring of 1904 the Sanford & Brooks Company, which was engaged in the dredging business, had a contract with the government for cutting away a portion of Hospital Point in Norfolk harbor, and, needing additional equipment, entered into negotiations with the Virginia Dredging Company for the hire of its tug the E. J. Codd and three mud scows, known as Nos. 9, 10, and 11, which plant was at that time in New London, Conn. The negotiations resulted in a contract for the hire of this equipment, the Sanford & Brooks Company agreeing to pay $1,200 (afterwards increased to $1,260) per month for the tug, and 2 cents per cubic yard capacity per day for each of the scows. They also were to pay a part of the towage charges for bringing this equipment to Norfolk. The contract was not in writing, but was the result of interviews between the parties, and correspondence. Inquiry was made by a representative of the respondents as to the condition of the scows, and he was told that so far as he knew they were in good condition, as they had been but a short time before engaged in similar work in New London. He supposed they were all right, and knew nothing to the contrary. Upon the arrival of the scows in Norfolk,

early in May, complaint was made as to their condition, and respondents declined to accept them as they were, and upon receiving these complaints the owner of the scows ordered its representative at Norfolk to have them put in condition satisfactory to Sanford & Brooks. Certain repairs were made, about $3,000 in all being expended upon them. The repairs on scows Nos. 9 and 11 were completed before May 23d, on which day there was a meeting between the parties at Baltimore for the purpose of arriving at an understanding as to the date of the delivery and acceptance of the scows. At this meeting Jeffress, the president of the libelant company, and Brown, its agent, who had superintended in its behalf the repairs at Norfolk, represented the libelant, and Sanford & Brooks represented the respondents. The following letter gives the result of that interview:

"Baltimore, Md., May 23, 1904.

"Mr. Thomas F. Jeffress, President Virginia Dredging Company, Hotel Jefferson, Richmond, Va.—Dear Sir: Referring to our interview to-day, we understand the following to be the result: We agree to pay you for the tug 'Codd' $1,262 a month instead of $1,200. In regard to the scow hire, we agree to pay you for the yardage that the scows have produced in accordance with the statement inclosed herewith, it being understood that we will not take the three scows until they are finally overhauled and turned over to us; # 11 having been completed and turned over to us on the 16th inst., # 9 we understand was turned over to us on Saturday last, May 21st, and # 10 is now under repairs. In regard to the towage bill which you paid for bringing the scows and tug from New London, we agree to pay $600 towards this bill.

"Very truly yours,             W. B. Brooks, Jr., Vice President."

Subsequent letters show that scow #10, upon which repairs were made to the extent of $1,500, was accepted as of date June 21, 1904. The Virginia Dredging Company on or about July 29, 1904, assigned and transferred all its interest in this contract and in the tug and scows to the Columbia Dredging Company, the above-named libelant. Testimony as to the precise nature of the repairs made upon the scows prior to their acceptance is lacking; Sanford, who represented the respondent company, being dead at the time of the hearing, and Brown, who supervised the work on the part of the libelant company, being then in a dying condition. When the contract was made no definite time was fixed for the use of the scows. They were kept by the respondents about 14 months. The question for our determination is whether the respondents are entitled to recover from libelant the amount expended for repairs to the scows after their acceptance, and for the loss of time when they were undergoing repair. We do not find in the record an exact statement of the nature of these repairs, but we infer that the greater part of the expense was in providing new gear, as we find from the correspondence that complaints were made that the ratchets and pawls were defective, so that the scows were dumping their pockets, and a new set of steel castings were put in; the old ironwork that operated the pockets being removed. The commissioner, whose report was in favor of the respondent upon this item, does not state precisely what the repairs were, but finds generally that they were "unseaworthy and unserviceable by reason of structural weakness or defective appliances." The court below, in its opinion on this point, says:

"The repairs charged for, and which form the subject of the exception under consideration, were all made subsequent to this final acceptance of the scows, and at periods covering from one to five months thereafter, and in the opinion of the court the changes are made up chiefly of such items of repairs as became necessarily incident to the working of the scows, or of improvements rather of a permanent character in the structural makeup of the scows, which respondents saw fit to make for its own convenience and the better handling of the same. Manifestly, improvements of the latter kind could not be made at libelant's cost and without its knowledge and consent, and those of the former class were clearly such as the contract of hire contemplated the bailee should make."

In his letter of May 2d to Jeffress, president of libelant company, Brooks, the vice president of respondent company, says:

"If you will have your Captain Brown see Mr. Sanford, they will go over these scows together, and see what ought to be done with them."

In the letter of May 23d from the same to the same, as the result of the interview between the parties in interest, had for the purpose of fixing the date when the scows were to be accepted, there is this phrase:

"It being understood that we will not take the three scows until they are finally overhauled and turned over to us; No. 11 having been completed and turned over to us on the 16th inst., No. 9 we understand was turned over to us on Saturday last, May 21st."

—and No. 10, as appears from a subsequent letter, was accepted June 21st, so at the respective dates these scows were accepted as having been "finally overhauled." The respondents had abundant opportunity to ascertain their true condition; they accepted them, knowing the style of gear and its condition. After the middle of July, in reply to insistent demands of libelant for the more prompt payment of its bills, the respondents began to make complaint of the condition of the scows, but neither then nor at any time thereafter was offer made to return the scows, or any demand made upon the libelant that it should repair them. On July 23d Sanford writes to Jeffress, stating with considerable detail the defects in the gear, and that he had ordered a new set of castings, etc. On July 25th Jeffress writes to Sanford, calling his attention to the agreement of May 23d, which fixed the date of their acceptance of the scows, and says:

"It was clearly understood that from the date of these acceptances we were not to be called upon for any more repairs, but were to be paid at the charter rate from that time on"

—suggesting that possibly the trouble arose from inefficient help in handling them, stating that they had already made considerable concessions; that the charter price was 20 per cent. lower than the usual price, and distinctly repudiating any obligation on the part of the libelant to pay for these repairs. There is no contention that there was any express warranty or that there was any agreement on the part of the libelant to pay for these repairs. The respondents' case rests entirely upon the implied warranty, to wit:

"In every contract for the carriage of goods between the person holding himself forth as the owner of a lighter or vessel ready to carry goods for hire and the person putting goods on board or employing a vessel or lighter for

that purpose it is a term of the contract upon the part of the carrier or lighterman, implied by law, that his vessel is tight and fit for the purpose or employment for which he offers and holds it forth to the public."

And further:

"That this implied warranty means not only that the owners have used their best efforts to make her seaworthy, but she must in fact be so."

There is no dispute as to the correctness of these propositions. What constitutes seaworthiness varies with the occasion. A vessel may be seaworthy for a river or bay, and not for ocean navigation. That is not a happy term to use except with regard to that condition of a vessel which enables it to avoid exposure of the cargo to the perils of the sea, It must be sufficiently tight, staunch, and strong to resist the ordinary attacks of winds and seas. The cases are innumerable as to what constitutes seaworthiness where vessels are chartered for the carriage of goods, but they are rare as to what is meant by seaworthiness in craft similar to those in the case at bar. In The Northern Belle, 9 Wall. 530, 19 L. Ed. 746, Mr. Justice Miller, in the case of a barge loaded with wheat on one of the western rivers, which was sunk and the wheat damaged, says:

"She must be so tight that water will not reach the cargo; so strong that these ordinary applications of external forces will not spring a leak or sink her; so sound that she will safely carry the cargo in bulk through these ordinary shocks to which she must every day be subjected. If she is capable of this, she is seaworthy."

If this is a correct definition of seaworthiness, it cannot be doubted that these scows were sufficiently tight, staunch, and strong to float safely in the waters where they were employed; indeed it is not contended that they were not.

The defects alleged were with respect to the pawls, ratchets, and gear in use upon the scows for the purpose of discharging the mud and sand loaded upon them. No case has been cited, and our researches have not enabled us to discover one, where appliances of this nature have been discussed as affecting the question of seaworthiness. In the absence of direct authority, the case must be decided upon general principles, and we take it that there is no doubt that a warranty, whether express or implied, may be waived by agreement or by acts. If the scows had been sold outright on May 23, 1904, after the respondents had full opportunity to discover their condition, it could scarcely be contended that the respondents would not be bound to pay the purchase price agreed upon, whatever defects might have been subsequently discovered therein. The rule of caveat emptor applies to the sales of ships as in the sales of other personal property. 1 Parsons on Admiralty, 86. This rule is stated by Mr. Justice Davis in Barnard v. Kellogg, 10 Wall. 388, 19 L. Ed. 987, as follows:

"No principle of the common law has been better established or more often affirmed, both in this country and in England, than that in sales of personal property, in the absence of express warranty, where the buyer has an opportunity to inspect the commodity, and the seller is guilty of no fraud, and is neither the manufacturer nor grower of the article he sells, the maxim of caveat emptor applies."

In Kellogg Bridge Company v. Hamilton, 110 U. S. 116, 3 Sup. Ct. 542, 28 L. Ed. 86, Mr. Justice Harlan says:

"According to the principles of decided cases and upon clear grounds of justice, the fundamental inquiry must always be whether, under the circumstances of a particular case, the buyer had the right to rely and necessarily relied on the judgment of the seller and not upon his own. In ordinary sales the buyer has an opportunity of inspecting the article sold, and the seller, not being the maker, and therefore having no special or technical knowledge of the mode in which it was made, the parties stand upon grounds of substantial equality. If there be, in fact, in a particular case, any inequality, it is such that the law cannot and ought not to attempt to provide against. Consequently, the buyer in such cases, the seller giving no express warranty and making no representations intending to mislead, is holden for the purchase entirely on his own judgment."

On principle there would seem to be no reason why the rule thus stated should not apply here. Conceding to the full extent claimed that there is an obligation upon the owner of every vessel, implied by law, that his vessel is tight, staunch, and fit for the purposes for which he holds it forth, and that this means not only that the owners have used their best efforts to make her seaworthy, but that she must be in fact so, the proofs show that these scows were sufficiently fit, tight, and staunch to fulfill the warranty. The claim for which the respondents filed their cross-libel is not for work done upon the scows to enable them to float safely, but in the main is for repairs and improvements upon the gear, ratchets, and pawls; the old gear being found defective. They had full opportunity to discover the nature of this gear at the time they accepted the scows. The owner made no representation as to its condition, and did nothing to divert the eye or obscure the observation or mislead the respondents in any way. The defects in the gear were plainly discoverable. They were not such as required the exercise of special skill or care to detect them. With full opportunity to examine, they must be presumed to have used their senses, and if by ordinary care—that degree of care that men are generally capable of exercising—they omitted to use their senses, but closed their eyes, they cannot claim now to have relied upon an implied warranty. They could have amply protected themselves by inspection which would have disclosed the true condition and quality of the gear, and could have refused to accept them. If after their acceptance certain defects were discoverable not obvious before, they should, within a reasonable time, have notified the libelant, and allowed him opportunity to remedy the defects. It is true that, as appears from the correspondence, they did from time to time make complaint as to the condition of the scows. These letters were written in response to the demand of libelant for payment of the stipulated hire, but in no case did they make any offer to return the scows, or demand that the libelant should make the repairs as a condition of their further retention. The letter of the president of the libelant company of July 25th, already referred to, clearly notified them that the libelant would not pay for the contemplated changes and improvements, of which respondents informed him in their letter of July 23d. This failure to give notice, coupled with the fact that they retained possession and

continued to use the scows longer than was necessary for a trial, is conclusive against their right to assert a breach of the implied warranty. It is well settled that, in the absence of contract, the lessee is not entitled on the expiration of tenancy to any compensation from the lessor for any improvements made on the demised premises.

We have not been able, after a somewhat exhaustive search, to find any case directly in point on the questions arising here. One of the cases cited by appellee as to a waiver of the warranty may be referred to. It is from the Circuit Court of Appeals, Ninth Circuit, Waterhouse v. Rock Island, etc., Co., 97 Fed. 466, 38 C. C. A. 281. The third syllabus is as follows:

"Where the undisputed evidence showed that a vessel was examined by a charterer, and accepted by him with full knowledge of the condition of her machinery and appliances, it was not error to instruct the jury, in an action count of damages and delays alleged to have resulted from the defective condition of such machinery and appliances should not be considered unless the to recover her hire under the charter, that claims set up by defendant on account defects complained of were latent and unknown to defendant."

By the terms of the contract of hiring, the respondents agreed to "keep the scows in as good repair as they are when received, and return them in like manner; ordinary wear and tear excepted." By the civil law in cases of the locatio rei or letting to hire, the letter is bound to keep the thing in suitable order and repair for the purposes of the bailment. This is considered by Pothier as an obligation arising by operation of law, from the fact that the enjoyment or use contemplated by the contract cannot otherwise be obtained. That obligation extended to all faults or defects which went to the total prevention of the use or enjoyment of the thing, but not to those which render the use or enjoyment less convenient, and the letter was bound to reimburse to the hirer the necessary expenses incurred about the thing hired; but this is not the rule of the common law, where the landlord without an express agreement is not bound to repair, and the tenant must make necessary repairs at his own expense. Other implications may arise from the usages of trade and the customs of the place. Central Trust Company v. Wabash, etc., Railway Co. (C. C.) 50 Fed. 857, was a case in equity, where the bailor sought to recover compensation for the use of certain cars, and the bailee interposed as an offset for repairs to the cars made while in his possession. Thayer, Circuit Judge, refused to allow the offsets interposed, saying:

"By the civil law the bailor for hire is bound to keep the thing in order or in a state of repair suitable for use. No such absolute liability, however, is recognized by the common law. Whether the bailor or the bailee is bound at common law to pay the ordinary expenses incident to keeping the article hired in a state of repair while in the custody of the bailee seems to depend largely on custom and usage and the character of the article, when the matter is not regulated by express contract between the parties."

There is no testimony in this case as to any usage or custom.

Ripley v. Scaive, 5 Barnewall & Cresswell, 167, was an assumpsit on a charter party, where the freighter of a ship agreed to pay for her £200 per month for six months' service. The ship was to be kept in

repair by the owner. Before the termination of the voyage for which the ship was chartered certain repairs were necessary, which occupied a period of 28 days. It was held that the freighter was not entitled to deduct those days in calculating the period for which he was to pay freight. The contention was that, if the freighters were bound to pay freight for the period of time consumed in repairing the vessel, the repairs would, in effect, be done at their expense, and not at the expense of the owner; but the court held the freighter bound to pay the full amount stipulated.

The judgment of the District Court is affirmed.