## FIDELITY & DEPOSIT COMPANY *v.* SANFORD & BROOKS COMPANY.
[No. 1, January Term, 1930.]

*Decided March 11th, 1930.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Washington Bowie, Jr.,* and *J. Fearon Brown,* with whom was *W. Dickson Cunningham* on the brief, for the appellant.

*Harry N. Baetjer,* with whom were *J. Crossan Cooper* and *Venable, Baetjer & Howard* on the brief, for the appellee.

BOND, C. J., delivered the opinion of the Court.

The Sandford & Brooks Company, owner of a marine dredge, sued the surety on a bond given to secure performance of a hirer's contract, for loss from damage to the dredge while hired, and failure to return it. During the period of the hiring, the dredge was, because of bad condition of the hull and leaking, towed by the hirer into shallow water, grounded, and abandoned. And the contentions in the suit raise a question of responsibility of the hirer for the leaking, and, quite apart from that, another question of its responsi-

bility for the ultimate necessity of sinking and abandoning the dredge, given a leaky condition from any cause. The case was tried below before the court without a jury, and verdict and judgment were entered against the surety for the full amount of the bond. On the appeal, exceptions are presented to rulings on evidence, and to the prayers for instructions or declarations of law.

The dredge was hired in April, 1925, for work of a Lago Oil and Transport Company, at the island of Aruba, of the Dutch West Indies, near the coast of Venezuela. It was chosen by an agent of the Lago Company from several dredges of the Sanford & Brooks Company, then in the harbor of Charleston, South Carolina. And the contract of hiring, contained in a letter of the Lago Company to the owners under date of April 24th, 1925, provided for a charter for not less than five months, to start May 1st, 1925, at a specified monthly rental, to be re-delivered to the owners at Charleston in the same condition as when delivered, ordinary wear and tear excepted, or at the option of the hirer, to be purchased within a year for $65,000, and the hirer was to keep the dredge insured against marine risk. The bond, executed later, was one guaranteeing the terms of that contract.

The dredge was put in dry dock at Charleston between three and four weeks for reconditioning and special fitting for the voyage, and was repaired and conditioned as desired by the agent of the hirer, except in one respect which is without importance in the case, and except that the agent suggested putting a galvanized iron sheathing on the hull for protection against worms, a measure which was not adopted as the owner did not think it necessary. There was evidence that the agent, Mr. Salmons, inspected her before she went into dry dock, and his engineer inspected her at least once while in dry dock, and some one from Mr. Salmons' office looked at her from time to time, every other day or every third day, while in dry dock, to see how the work was progressing. Mr. Salmons satisfied himself that she would make the trip to Aruba, stay there during the months they needed

her, and do the work required of her. For protection against injury from worms, the hull was sheathed under water with wood lined with tar paper or felt, and new sheathing was put on as desired by the hirer. Protection of that kind is temporary, in that it is not expected to resist entry of the worms entirely, but to take up their destructive action and be replaced, saving the planks of the hull proper from that action. A survey was made by representatives of the United States Salvage Association, "in order" as the certificate of survey stated, "to determine for underwriting purposes the general condition and making such recommendations as necessary for voyage of dredge in tow from Charleston, S. C. to Aruba, Dutch West Indies." The recommendations were carried out, and thereafter a certificate of seaworthy condition was issued. The voyage was made successfully, and the dredge was put in continuous use thereafter at Aruba.

On April 13th, 1926, the Lago Company notified the owner that it would not exercise its option to purchase, but expected to be able to return the dredge at Charleston during the month of May, 1926. But a letter of August 27th, 1926, from the hirer, notified the owner that use of the dredge had been abandoned, and surveyors had examined it and refused a certificate of seaworthiness for insurance for the return voyage, and the dredge had therefore been towed into shallow water and left there at the risk of the owner, and that the charter was terminated. The dredge has since remained as thus left at Aruba.

The owner, as plaintiff, adduced the evidence to prove that the dredge was in good seaworthy condition when delivered to the hirer, and the defendant surety adduced evidence to show that the hull became unseaworthy because of rotting of the planks and the inroads of worms, principally because of rotting, and to the charge of negligence adduced further proof of ordinary careful use of the dredge. The defendant contended that on the facts the damage by worms was not a factor of importance in the disablement of the dredge, and such repairs to the sheathing as were required

had been made by it. As to the rotting of the planks, there was evidence on the one hand that rotting is ordinarily a slow process, a matter of several years, and evidence on the other hand of some possibility of rot from condensation of steam and consequent dampness in the hull from the operation of the dredge. The defendant contended that rot from this source could not have disabled the dredge.

There was a complete demise of the dredge, the owner divesting itself of possession and control, and the hirer taking her into its complete possession and control, (*State v. Ballo. & S. Steam Co.,* 13 Md. 181, 189; *Leary v. United States,* 14 Wall. 607) and the hirer was bound to return her in like order and condition unless injury or loss should be occasioned by some cause not attributable to a lack of care of the hirer in the performance of its obligations. *Darby Candy Co. v. Hoffberger,* 111 Md. 84; *Security Storage Co. v. Martin,* 144 Md. 536; *The Carroll,* 248 Fed. 475; *White v. Upper Hudson Co.,* 148 Fed. 893. Whether the owner should be held to warrant the seaworthy condition of the dredge, and was under an obligation to maintain that condition, we find it unnecessary to determine. The preliminary inspection made on behalf of the hirer would have to be considered in the determination of that question. *Sanford & Brooks Co. v. Columbia Dredging Co.,* 177 Fed. 878; *The Transit,* 250 Fed. 71. The maintenance of wooden sheathing as a protection against worms could not, we think, be included within such an undertaking of the owner, in view of the temporary nature and purpose of the sheathing, and the expectation of the parties that it was to be renewed as needed. Such a protection would seem to be rather a matter of upkeep or running repairs, like the upkeep of the copper paint used on hulls in the waters of this state. *Story, Bailments,* secs. 388 and 389; *Sanford & Brooks Co. v. Columbia Dredging Co.,* 177 Fed. 878, 884; *Williamson v. Phillipoff,* 66 Fla. 549. The defendant adduced evidence that it was customary for the owner to stand the burden of maintaining such sheathing, but the evidence seems to us to fall short of being sufficient to show

a general custom entering into all such hirings, even when the vessels are removed to foreign parts entirely out of the hirers' possession. On the contrary, it appears from the uncontradicted evidence that the hirer in this case did actually make repairs to keep up the sheathing, and the hull too, without reference to the owner. Renewals and replacements of the sheathing would, we conclude, be within the undertakings and duties of the hirer.

The testimony presented by the parties was concerned almost altogether with the dispute on the cause of the deterioration of the hull, whether by rotting or by worms, and the care exercised by the hirer with respect to possibilities of deterioration from these sources. Some questions were asked by the court, however, relative to further care to avoid loss from the deterioration, and at the conclusion of all the evidence the court framed an instruction or ruling covering this point, too. And the objections to that action are the first pressed in argument on the appeal. The instruction was, in effect, that when the hirer became aware of the fact, if it was a fact, that the use of the dredge by it was causing deterioration which if carried far enough would cause unseaworthiness of the hull, then it was its duty to stop the operation before unseaworthiness was reached, and notify the owner in time to enable it to forestall the loss by repairs. All the other rulings of the court fixed due care as the measure of the hirer's duty, and the instruction is in effect that due care absolutely required these actions before it was too late.

It is earnestly objected that in this ruling the court acted upon a new theory of the case, which was not advanced by either party and which surprised the defendant, and, its witnesses having departed, left it without an opportunity to present testimony relevant to the determination of the facts supposed. No application was made for a reopening of the testimony for that purpose. But the decisive answer to the contention in this respect seems to lie in the fact that, by the nature of the case, a question of care in discovering and averting the danger was to be anticipated. The hirer of a boat, entrusted to its exclusive possession 1,300 miles from the

owner, has a duty to see that measures apparently needed to preserve it are taken, even when the particular measures should ultimately be at the expense of the owner. The peculiarity of the situation has legal effects. The owner could not, of course, be expected to watch over and maintain its property 1,300 miles away, out of its control, and the hirer could not expect to be free of any obligation of care for the property thus entrusted to it, and permitted to let it go to destruction without interference. 1 *Parsons, Shipping,* 309; *Kimball v. Tucker,* 10 Mass. 192; *Higman v. Camody,* 112 Ala. 267; *Dunwoody v. Saunders,* 50 Fla. 202, 204; *Harrington v. Snyder,* 3 Barb. (N. Y.) 380. In this case, extraordinary repairs which might have been needed to the hull could have been arranged for and provided by the owner itself upon notice from the hirer, if such was the owner's obligation. But if the hirer was charged with notice of the danger in time, it was under an obligation to notify the owner, and so enable it to take action. *Higman v. Camody, supra; International Contr. Co. v. Walsh,* 115 Fed. 851. And if a cessation of operations with the dredge was a measure necessary to avoid an apparent danger, the hirer was under an obligation to cease. He was in a position analgous to that of the hirer of a horse which has become sick or disabled during use by the hirer. *Higman v. Camody, supra; Thompson v. Harlow,* 31 Ga. 275. "But if the horse falls sick, or becomes exhausted, the hirer is bound not to use it. And if he does pursue his journey and use it when reasonable care and attention would forbid, he would make himself responsible to the owner for that act." *Leach v. French,* 69 Me. 389, 392. These were duties on the hirer which were likely to come into question in the present suit, upon the taking of evidence on what had occurred at Aruba, and so constituted an important part of the case to be anticipated at the outset; and we find no impropriety in the court's making with reference to them the ruling of law it did make. There is nothing found in the declaration so restricting the ground of liability as to exclude this inquiry.

It is next objected that this instruction imposed absolute duties upon the hirer to take action when the ordinary care which was the limit of its duty may not have dictated the action. The instruction ruled, not that the hirer was required to stop using the dredge upon the appearance of progressive rot due to use, as is argued, but that the hirer should not thereafter have continued the damaging use until the vessel became so unseaworthy that it could not be moved for repairs. And in the opinion of this court it was not improper to rule that there was an absolute duty to stop short of that extreme. The second part of the instruction likewise ruled that if the hirer had knowledge that the dredge was being made unseaworthy by continuation of the use of it, a duty devolved upon the hirer not to carry the process so far as to disable the dredge from being moved for repairs, without notifying the owner in time to permit it to make the repairs. It may be said that the instruction allows no latitude for honest mistake in judging when the time to stop or notify the owner has arrived, but it fixes only the limit beyond which the decay should not be allowed to run on without action; and that would seem to be an ascertainable limit, and one which the hirer should, in the exercise of care, not exceed in any event. These objections seem to the court not substantial ones.

The defendant filed special exceptions to the instruction, several of them on the ground of lack of evidence to support its hypotheses of fact. And on these it must be borne in mind that the court had before it evidence from which it could find that there was no considerable rot in the hull when hired, and that the vessel was in a condition to make the voyage to Aruba and stand the use intended. The dredge had been put in dry dock between three and four weeks, inspected by both parties and by surveyors for the underwriters, and worked over. And both parties were satisfied of the condition as stated. Both parties, too, gave testimony that rot is ordinarily a slow process, covering several years of time. Yet the court, if it found those facts, was confronted with the further facts of some deterioration by rot or worms

within six months, necessitating repairs by the hirer in four spots to stop leaks, and final abandonment of the dredge as unseaworthy seven months later. And the witnesses agreed that there had been no accident and injury from outside. Accepting these facts, as the evidence permitted, an inference of a cause or acceleration in the use by the hirer would seem to need slight evidence, if any, to support it. And there was testimony of three witnesses for the defendant, Stein, Walker, and Captain Roger, and of one Craig, for the owner, that drying and cooling of escaped steam in the hull causes decay, and that this action goes on all the time in a dredge in use, at least if the machinery is not well packed. The witness Captain Roger said he knew nothing that contributed to the rotting of wood more than condensation, and that well-packed machinery should not cause that. Good ventilation, it was testified, was the only thing that would slow down the action of decay from this source. An unusual amount of leaking was first observed in December, 1925, as has been stated, and it was found necessary to make repairs in four spots. And the superintendent of the hirer, Captain Roger, gave it as his opinion that the dredge could have been taken back to Charleston at that time. In February, 1928, a letter was written by the captain of the dredge to Mr. Salmons, saying: "The machine is in good condition and I think that she would go back to the States all right if the insurance would let her and if the inspector doesn't look too close inside. But it would be a good thing to put her in dry dock if we could." Walker testified that the dredge commenced to leak more than usually six or eight months after her arrival at Aruba, and the leaking and repairing became a general subject of conversation or inquiry. Before the following August, efforts were made by patching and caulking to stop the leaking, and Captain Roger was of opinion that the vessel could not have remained afloat an hour without that patching and caulking. In August, the wood in the hull generally was found to be of a soft pulpy nature, rotten, and so bad that the abandonment was decided upon. And then, for the first time, notice of the dangerous nature was

sent to the owner. In this testimony, without reciting other testimony reviewed in argument, tending to prove those conclusions or to contradict them, we think there was legally sufficient evidence to support the findings supposed in the court's own instruction, evidence, that is, of a progressive leaky condition caused or promoted by operation, notice to the hirer, or facts to put the hirer upon notice, of this condition and the danger, and yet continued operation while the hull passed from seaworthy to defective but repairable, and finally to disablement beyond repair, all without warning to the owner—assuming that it would have been upon the owner to dry dock the dredge and make timely repairs if notified. There is contradiction or ground for contesting the conclusions of fact stated in the instruction, but on appeal we are not deciding the facts; we have to consider now whether any evidence was given from which the facts could legally be found, and we think there was sufficient in law for that purpose.

Two exceptions were based upon failure of the instruction to draw a distinction between normal and abnormal or negligent operation of the dredge, but this instruction did not base liability on negligence in producing the leaky condition, but only on negligence in failing to take care to avoid extreme consequences, however the leaking may have been caused. The distinction seems, therefore, to be immaterial in this instruction. And, again, objection is made to a lack of distinction between normal and abnormal leaking, and the same answer applies. But as the whole controversy was concerned with abnormal or unusual leaking, there could be no doubt of the meaning of the court's ruling, we think. Objection is made that the contract did not require any notice of bad condition to be given the owner, and there was no evidence of custom or practice for a hirer to do so. For reasons already stated, we think the lack of these elements in the case is immaterial; the legal duty arose out of the circumstances. *Higman v. Camody,* and *International Contr. Co. v. Walsh, supra.* Lastly, it is objected that the issue of knowledge of the condition by the hirer was not raised by the pleadings or

the theory upon which the case was tried. And, as has been said, this court disagrees with that argument, and views the issue as part of the general issue of negligence raised by the filing of the suit. The instruction was, in our opinion, free from reversible error.

The refusal of prayers of the defendant that a verdict be directed in its favor is next pressed upon appeal. One prayer requested a general ruling that there was no legally sufficient evidence of want of ordinary care on the part of the hirer, and the other a ruling that there was no legally sufficient evidence of negligence of the hirer which caused the unseaworthy condition of the dredge. And by reason of each of such rulings, a verdict was requested for the defendant. The general ruling first asked, on the absence of evidence of any negligence, would be in conflict with the ruling embodied in the instruction framed by the court, concerning negligence in not averting the extreme consequences, a ruling which this court has found supported by some evidence, and the prayer was, therefore, properly refused, for reasons already stated. The second prayer, marked 1a, on the lack of legally sufficient evidence of negligence causing the unseaworthiness of the dredge, we find likewise properly refused. There is no dispute on the principle that recovery can be had only for negligence of the hirer, and none on the rule of the burden of proof. The plaintiff had throughout the case the burden of establishing the ground of recovery. Upon its showing of delivery of the dredge in good condition and the failure to return, and abandonment in bad condition, it was entitled to recover unless and until the defendant produced evidence showing the cause of loss, and then the plaintiff had the burden of establishing the fact of negligence on the whole evidence of the cause of loss and the circumstances surrounding it. *Darby Candy Co. v. Hoffberger,* 111 Md. 84; *Hambleton v. McGee,* 19 Md. 43. Review of cases in note, "Presumption and burden of care in actions for injury to or loss of boat during bailment," 11 *A. L. R.* 690; 23 *A. L. R.* 276; 40 *A. L. R.* 874, 882.

There was evidence of deterioration of the planking from the two causes of the inroads of worms and rot. So far as the inroads of worms may have contributed to the result, there was legally sufficient evidence to support a finding of negligence in failing to keep up the sheathing. The sheathing was renewed in part by the hirer, but renewed only while the dredge was in the water, so that it could not be nailed to the planking below the water line; and there is testimony that such attachment does not exclude worms. On July 23rd, 1926, Mr. Salmons wrote the owner that the dredge needed resheathing and he was considering removal to a dry dock. Captain Roger disagreed, and thought the condition of the dredge would not permit the voyage to the nearest dock, 560 miles away. Two witnesses testified that such a vessel should be hauled out and examined once a season, and the sheathing renewed as necessary. And so far as concerns the rot as a contributing cause, we have already stated our view that the hirer may have been found negligent at least in the omission of measures to forestall the ultimate result after the danger became evident. In our opinion there was also legally sufficient evidence of negligence in operating the dredge in such a way as to cause the wetting by steam and drying out which would, according to the testimony, tend to produce the rot. The direct evidence of this is slight, but we are not concerned with the result of all the evidence. Starting with the strong evidence of good condition at the time of delivery of the vessel, and its sufficiency then for the voyage and use, and the general opinion that rot is ordinarily a slower process, only slight direct evidence of an abnormal damage in use, causing the rot, would be necessary. And as has been stated, there was evidence of injurious wetting and drying by reason of unnecessary escape of steam into the hull. It may be added that a prayer for a verdict upon lack of evidence of negligence causing the unseaworthiness could not be granted in view of the possibility of liability for not forestalling the ultimate results.

In granting a third prayer of the plaintiff, the court ruled

that a verdict should be rendered for the plaintiff upon the court's finding as facts that the dredge was, when delivered, in good seaworthy condition, capable of performing the work for which it was rented and of being returned, that the hirer did not use reasonable care in its maintenance and make the running repairs usually and customarily made, and that as a consequence the hirer was unable to return the dredge. And this action of the court was excepted to. Special exception was taken on the lack of evidence to show what are repairs usually and customarily made. It has already been explained in this opinion that we find evidence legally sufficient to support these findings of fact. The appellant objects that the phrase "running repairs" is one of indefinite meaning, but we think the objection not well taken. The running repairs would seem clearly enough to signify those which would be made in the upkeep of the vessel by one in charge of it during a season of operation. It is a broad phrase, but it could hardly be made more definite, and there seems to be no likelihood of its having imposed an improper legal burden on the hirer. At least, it seems to us, it could not refer to any more extensive repairs than the hirer would be required to make. And there is evidence of the need as well as the custom of maintaining the sheathing so that worms may be kept from the hull, of hauling such a vessel out at intervals for examination to ascertain and meet the need of repairs in any particular, and generally it could have been found from evidence that rot, which could have been avoided or corrected, was not avoided or corrected. We think the action in this instance free from error.

A fifth prayer of the plaintiff, granted by the court, fixed the measure of recovery as the fair market value of the dredge at Charleston, at the date and in the condition proper for return under the contract. The appellant objects that the evidence is insufficient to support a finding of market value at any date, but no special exception was taken to raise this objection below, and it is not before this court on appeal. Code, art. 5, sec 10; *Nichols v. Meyer*, 139 Md. 450, 460.

A further objection is that the contract did not fix a time for return of the dredge, and the ruling is therefore based upon a determination of fact that cannot be determined. But it would seem that the time for return under the contract was clearly enough the time when the hirer concluded its use of the dredge in the summer of 1926. And the condition supposed would be the condition it should have been in at that time, if there had been the proper use and diligent care required of the hirer. We find this prayer free from objection.

A sixth, granted prayer of the plaintiff was for a ruling similar to that embodied in the instruction framed by the court itself, and already discussed in this opinion. And what has been said in that discussion answers the objections to the present ruling. The ruling was that, if the hirer knew that the dredge was leaking in December, 1925, that it continued to leak uninterruptedly until August, 1926, that the hirer neither repaired the leaks, nor notified the plaintiff of them and afforded it an opportunity to make the repairs, and that the leaks could have been repaired in time to prevent the unseaworthiness of the vessel, and failure to repair caused the unseaworthiness, the verdict must be for the plaintiff. A special exception raises an objection on the ground of lack of evidence to support a finding that the leaking continued uninterruptedly from December, 1925, to August, 1926, but the evidence already reviewed here seems to have been legally sufficient for that finding. It seems sufficient to say now that it was testified that after about Christmas of 1925 the leaks became a subject of continual conversation or inquiry. The objection is again made that in its reference to leaking the prayer does not distinguish between leaking which normally goes on in any wooden vessel and the abnormal leaking which would necessitate repairs; but, as has been said, there could not possibly have been any need of drawing that distinction in a case concerned entirely with the abnormal leaking. The court could not have misled itself in its consideration of the facts. Another objection is that the prayer assumes as a fact that the vessel was seaworthy prior

to the time the leaks occurred and that the repair of the leaks would have made her seaworthy. But as all the testimony of both parties describes the vessel as seaworthy up to December, 1925, we do not see that there could be any error in taking that to be a fact. And the construction on which the objection is based seems strained. We find no error in the granting of this prayer.

The appellant urges that, in the prayers granted at the request of one party and the other, there are inconsistencies which make the total effect misleading, so as to vitiate the trial and require reversal. In the defendant's granted prayers, it is urged, the ground of liability was stated as negligence in the use of the dredge hired, while in the instruction framed by the court negligence in failing to take measures to avoid the results of deterioration, even though not caused by use of the dredge, is taken as a ground. But the references to negligence in the defendant's prayers were broadly worded, and we see nothing in them to restrict the ground of negligence materially, so as to conflict with the court's instruction Again, it is urged that in the defendant's prayers ordinary care was stated as the limit of its obligation, while in the court's instruction the highest degree of care or absolute duty is required in giving the owner notice in time to have repairs made. This is an objection already considered, and discussed in connection with the court's own instruction. There is no inconsistency. The court's instruction merely states a duty required in the exercise of care.

An inconsistency is found also between the requirement of care to avoid loss to the vessel, or of notice of deterioration to be given to the owner, and a prayer granted for the defendant, which held the owner and not the hirer to be obliged by the contract to maintain the dredge in a condition of seaworthiness and fitness for the work. But, it would seem to be unnecessary to construe that ruling on the defendant's prayer as requiring the owner to watch over and maintain the condition of the dredge 1,300 miles away, out of its control, and to relieve the hirer in exclusive possession of all

burden in care of the property in this respect. It has already been pointed out that, even though the burden should rest ultimately on the owner, the hirer would have under the circumstances the duty to forestall loss, with which the court's own instruction was concerned. The defendant's twentieth prayer might have been made more clearly consistent, but we do not find any such inconsistency as might necessitate a retrial of the case for correction. The objection is rather to phrasing, and there is no substantial error feared in application of the law to the case.

The exceptions pressed to rulings on evidence are all to the exclusion of questions asked by the defendant of the vice-president and general manager of the plaintiff company. He was first asked whether, after having seen the surveyors' certificate of inspection at Aruba, he would now say, adhering to an opinion formerly expressed, that the hirer should have attempted to return the dredge in August, 1928. And two subsequent questions were substantially the same, whether he thought or contended that the hirer should have attempted to bring the dredge back. But these were not questions for testimony. They seem to ask only for the party's contentions in the case; and these were fixed by its attorneys, presumably, and the client, being represented by attorneys, should not be required to answer. Nothing material was excluded from the case by these rulings.

We find no error in other rulings excepted to.

*Judgment affirmed, with costs to the appellee.*